HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| RYAN NEIL MORRISON,<br><br>　　　　　　Petitioner,<br><br>　　v.<br><br>FANY DAMIAN CHANG<br><br>　　　　　　Respondent. | CASE NO. 2:23-CV-1655-RAJ<br><br>ORDER |

I.　INTRODUCTION

This matter comes before the Court on the Petition for Return of Children Under the Convention on the Civil Aspects of International Child Abduction ("Petition") filed by Ryan Neil Morrison ("Petitioner"). Dkt. # 1 The Petition seeks the return of the minor child, R.E.M., to his custody in Mexico. Petitioner alleges Respondent Fany Damian Chang ("Respondent") wrongfully retained the child in Washington in 2022 and abducted the child from Mexico in March 2023. Respondent filed an Answer opposing Petitioner's request and asserting a grave risk defense. Dkt. # 10. Respondent argued that, pursuant to an Island County Washington Superior Court order, she is the primary caregiver and to

remove the parties' child to Mexico would expose the child to grave psychological and physical harm. *Id.* at 52.

This Court held an evidentiary hearing on the Petition on March 28-29 and April 2, 2024. Dkt. # 18-20. At the hearing, the Court received testimony from Petitioner, Respondent, Candice Jordan (mother of Petitioner) and Carrie Whitney (friend of Respondent). Further, the parties entered various exhibits into evidence.[1] For the reasons set forth below, the Court **DENIES** the Petition.

## II.    FACTUAL FINDINGS

Petitioner was born in the United States and obtained permanent residency in Mexico in November 2019, although he currently lives near Island County, Washington due to the parties' ongoing dispute. Petitioner owns a company that utilizes technology and analytics in the usage-based automotive insurance space and can work remotely. Respondent was born in Mexico, currently lives in a tiny home community in Island County, Washington and is a preschool teacher in Whidbey Island. Respondent has a teenage son, D.D.M., with her former partner, Miguel Rubalcava. The parties met at an ultimate frisbee tournament in Quintana Roo, Mexico in 2015. Petitioner lived in Washington at the time and had traveled to Mexico for the frisbee competition. In November 2016, the parties married in Mexico. In 2017, Respondent and D.D.M. received residency in the United States, and they lived in Whidbey Island with Petitioner. During this time, Respondent received a certificate to be a Spanish medical interpreter through Everett Community College. In 2018, Respondent became pregnant. She spent most of her pregnancy in Washington, but in March 2019, the parties traveled to Mexico

---

[1] Under the Hague Convention, courts apply a relaxed standard regarding the authenticity of documents and when taking notice of foreign law. For example, authentication of documents and information is not required for such information or documents to be admissible in court. *See* 22 U.S.C. § 9005.

ORDER- 2

and Petitioner purchased a home in Baja California Sur, Mexico (the "Buena Vista house"). The house was purchased in Petitioner's name only. Respondent described the home as an investment property. Petitioner also owned a home on Lone Lake Road in Langley, Washington. Respondent gave birth to R.E.M. in June 2019 in Anacortes, Washington.

The parties only child in common, R.E.M., has a birth certificate issued by the State of Washington and one issued by the Mexican state of Chiapas. Soon after R.E.M.'s birth Respondent's parents traveled to Washington to meet the new baby and assist Respondent in her postpartum recovery, but soon had to return to Mexico because their tourist visas were set to expire. R.E.M. spent the first few months of his life in Langley until the parties traveled to Mexico in September 2019. Respondent experienced medical complications following R.E.M.'s birth and wanted the continued support of her family as she recovered. At that time, the parties applied for Mexican citizenship for R.E.M., as the parties wanted him to have dual citizenship. Furthermore, Petitioner oversaw renovations to the Buena Vista house, spending approximately $250,000 on the project.

The parties stayed in Mexico with R.E.M. until 2020. When the Covid-19 pandemic began in early 2020, the parties experienced a great deal of uncertainty about this living situation. The parties initially felt safe in Mexico, due to the low rates of Covid transmission there. Respondent was able to do some work, delivering food to neighborhood homes via a small business called 911 Organic in the spring of 2020. However, the parties eventually decided to return to the United States, due to concerns about the family's health and safety in Mexico as Covid rates in Baja California Sur began to rise.

According to Petitioner, the parties along with D.D.M. and R.E.M., returned to Washington in June 2020 to allow Petitioner to sell his home on Lone Lake Road, which ultimately occurred in October 2020. According to Respondent, Petitioner wanted to sell the Lone Lake Road home to dedicate the proceeds towards building a larger "dream

ORDER- 3

home" on a lot in Freeland, Washington that Petitioner purchased in August 2020. Respondent believed that their dream home would be spacious enough to accommodate the parties, D.D.M., and R.E.M. Respondent testified that when Petitioner sold the Lone Lake Road house, he asked her to sign paperwork that she now believes stated that she had no financial interest in the home. She testified that after signing the paperwork, she sat in the car and cried. However, Respondent did not object to the paperwork given to her by Petitioner, because she loved him and trusted him with their financial affairs, and generally did not want Petitioner to think that she was with him for his money.

Petitioner sold the Lone Lake Road home to former family friends Evelyn and George Vanderlip, who then rented the house back to the parties for a monthly rent of approximately $1000 per month. Petitioner and Respondent continued living in the home as a family unit. According to Respondent, the Vanderlips agreed to an affordable rent because they knew the parties were saving to build their dream home on their Freeland lot. During this time, the parties enrolled R.E.M. in school in Whidbey Island, and he attended school from approximately September 2020 to November 2021. Respondent started working at the South Whidbey Children's Center as a teacher, where she continues to be employed.

Soon, the parties' relationship with the Vanderlips took a turn for the worse. The parties felt that Eveyln was harassing them, and Petitioner sued the Vanderlips in September 2021 in Island County Superior Court. As part of that proceeding, Evelyn submitted a declaration to the court in which she described Petitioner as controlling and abusive towards women and Respondent in particular. Evelyn stated that, in the past as part of their friendship, she encouraged Respondent to stand up for herself; however, she would no longer do so, and instead communicate any concerns about the safety of Respondent or the children to the appropriate authorities. The Vanderlips also asked the parties to move out of the Lone Lake Road residence. In a September 6, 2021 email from

Petitioner (on which Respondent was copied), he told Evelyn that the parties "[did] not intend to move out any time soon."

The dispute with the Vanderlips appears to have had a negative impact on the parties' outlook. Although Respondent had a job and both R.E.M and D.D.M. were enrolled in school, Petitioner expressed a desire to go back to Mexico. Respondent testified that she did not want to leave the United States, but Petitioner felt the Vanderlips destroyed their lives. Petitioner asked for time to regroup and suggested that they continue remodeling the Buena Vista house so that they could rent it out on AirBnB. At this time, the parties sold furniture, gave away toys, and stored household items and children's clothing at the home of Petitioner's mother, Candice Jordan. The parties then went to Tijuana, Mexico, and from there, shipped four boxes of belongings to the Buena Vista house. A December 2021 photo shows Respondent standing in front of the boxes containing the family's belongings.

The parties arrived in Buena Vista on December 7, 2021 and stayed there until May 2022. The Buena Vista house, post-renovations, was now spacious and well-appointed, and they rented some portions of it out on AirBnB. During this time, the parties' relationship deteriorated, and Respondent expressed concerns about Petitioner's mental health and found his behavior to be erratic. According to Respondent, Petitioner was becoming paranoid and began eavesdropping on her conversations, and she emailed Petitioner's family expressing her concerns. However, Respondent still believed that the parties would continue building their dream home in Freeland and tried to make Petitioner happy in spite of his moods. Petitioner testified that he found the summers in Buena Vista to be too hot but had no intention of permanently moving back to the United States and suggested that the parties instead look for a summer house. Also, around this time Respondent began seeing a counselor, realized that she had low self-esteem, and began to feel that she was the only person trying to keep her marriage together. She felt

that she was not allowed to talk to Petitioner about getting a job or going to counseling to address strains in their marriage.

In the Spring of 2022, Petitioner proposed that the family look at homes in Oklahoma and Colorado. The parties, along with R.E.M. and D.D.M., flew to Tijuana, and from there took a road trip through Southern California, Nevada, Utah, Colorado, Kansas, and Oklahoma City. According to Petitioner, the parties found no affordable real estate to purchase, and he proposed going back to Buena Vista. Respondent, however, proposed that the parties return to Washington. Petitioner did not feel comfortable going back to Washington, due to his difficult relationship with his family.

The parties diverge when explaining their reason for returning to Washington in June 2022 and how long they intended to stay. According to Petitioner, the parties agreed that their stay in Washington would last no more than two weeks. Petitioner offered into evidence an email between Respondent and the executive director of the South Whidbey Children's Center with the subject line "Summer," in which they discussed R.E.M. re-enrolling in school and Respondent returning to work, with Respondent stating "We are back for the summer." Further, Petitioner submitted text messages from Respondent to Petitioner's sister wherein Respondent states that the family will stay "for some weeks."

Respondent, on the other hand, testified that the parties agreed that Washington would offer more stability and better opportunities for their family, and the Buena Vista home could provide consistent income as a vacation rental home. Further, according to Respondent, Petitioner was becoming very short-tempered, changing his mind from day-to-day as to where he wanted the family to live, and she wanted to permanently return to a place where she had connections.

The parties moved into the home of Candice Jordan, Petitioner's mother. R.E.M. and D.D.M. re-enrolled in school and Respondent began working again at the South Whidbey Children's Center. Petitioner states that he did not want to stay in the United States permanently and that both parties wanted R.E.M. to return to Mexico in August

2022 so that he could continue working on his Spanish skills. Respondent testified that in Summer 2022, Petitioner made several offers on houses and lots in Coupeville, Greenbank, and Boise, Idaho. Respondent submitted copies of September and October 2022 WhatsApp messages from Petitioner suggesting that they review homes in Washington, Texas, and Idaho, and noting that the schools were highly rated. As he searched for homes, he would drive by them at night to observe the safety and level of sound in the neighborhood. Respondent describes Petitioner's wishes as "always changing," and at some point, he purchased a ticket to travel on his own to Costa Rica. The parties also discussed getting a divorce.

It was also during this time that, according to Respondent, Petitioner expressed statements concerning self-harm, and Petitioner's mother shared with Respondent a phone number to a crisis hotline. Petitioner moved into the mother-in-law suite above his mother's garage, while Respondent, R.E.M. and D.D.M. remained in the home. Petitioner testified that Respondent's behavior in summer 2022 was volatile, that she had been physically violent towards him, and that she refused to take her prescription medication for a bi-polar condition. Respondent testified that she has never been diagnosed or treated for bi-polar disorder, but that she has been diagnosed with depression and anxiety, and has continued to be in therapy.

In November 2022, Petitioner purchased a flight to Mexico for himself and R.E.M. Petitioner asked Respondent to agree to R.E.M. traveling to Mexico, but Respondent refused. Petitioner then went to Mexico on his own. He characterized this visit as a necessary step in response to Respondent reneging on their agreement to return to Mexico as a family or allow Petitioner to return to Mexico with R.E.M. Petitioner did not give Respondent advance notice that he was traveling to Mexico. Petitioner filed for divorce in Cabo San Lucas, Baja California Sur in November 2022.

While Petitioner was in Mexico, Respondent moved out of her mother-in-law's home and into a house. Around this time, her employer asked for proof that she had been

vaccinated for tuberculosis. Respondent searched for her vital records in the box where the parties usually kept such documents and discovered that Petitioner had taken Respondent's and the children's vital records—such as vaccine records, school records, green cards, and passports—with him to Mexico.

Petitioner returned to Washington on December 13, 2022 and informed Respondent that he filed for divorce in Mexico. Throughout the holiday season, the parties discussed the terms of a potential divorce, but did not appear to reach an agreement—particularly concerning R.E.M.'s continued residence. Respondent testified that she sought to negotiate with Petitioner because she felt she had no option – she had no savings and had to rely on Petitioner for financial support. At one time, according to Respondent, Petitioner told her that she did not want to be a single mother with two children by different fathers. Respondent started to feel concerned that Petitioner would bring R.E.M. back to Mexico regardless of whether she agreed.

On December 28, 2022, Respondent filed for divorce in Island County Superior Court. The Superior Court issued a temporary restraining order restraining both parties from changing R.E.M.'s residence until further court order, except with the written agreement of both parties. Respondent submitted a declaration by Sandy Bright, filed in Island County Court, in which Ms. Bright states that she served divorce papers at the home of Petitioner's mother. Petitioner maintains that he was not served with the Island County divorce documents until they were emailed to his Mexican attorney in late January 2023.

On December 29, 2022, Petitioner texted Respondent stating that he was ready to take R.E.M. to Mexico, because school started on January 9, 2023. Respondent did not respond to Petitioner's message via text, although the parties spent New Year's Eve together. According to Respondent, the parties wanted to make happy memories for R.E.M. On January 3, 2023, Petitioner drove R.E.M. to Portland, Oregon and took a flight to Mexico. According to Respondent, she did not know where R.E.M. was at this

ORDER- 8

time. When R.E.M. had not been dropped off at his school by 11:00 a.m. as she expected, she contacted Petitioner's family, friends, law enforcement, and the FBI. Although Respondent was interviewed by the FBI, and worked to obtain relief via a Hague petition, she eventually felt that she could not wait for help from the authorities or through a Hague petition.

The parties were in sporadic communication throughout January 2023, although they could not agree on where R.E.M. was to continue living. On February 24, 2023, Petitioner sent respondent a text message stating that Respondent's former partner Miguel Rubalcava (and D.D.M.'s father) had come to the Buena Vista home and threatened to kidnap R.E.M. to enact revenge against Respondent. According to Petitioner, for years Respondent portrayed Mr. Rubalcava as an abusive former partner. But after speaking with Mr. Rubalcava and finding an alternate birth certificate for D.D.M. in Respondent's records, Petitioner came to believe Respondent was wrongfully keeping Mr. Rubalcava's child away from him—and that Respondent would do the same with R.E.M.

On March 2, 2023, Respondent traveled to Mexico, and she and her brother went to Dr. Maria Montessori School in Los Barriles, where R.E.M. was in attendance. According to Respondent, while in the building, she saw R.E.M. and they embraced. R.E.M.'s teacher (likely unaware of Respondent's identity) attempted to take R.E.M. away from Respondent. Respondent pulled R.E.M. away from the teacher and left the school with R.E.M. and her brother. With only his birth certificate, Respondent and R.E.M. went through customs in Tijuana and traveled to San Diego. According to Petitioner, Respondent and her brother approached the school under the guise of enrolling a new student. When she spotted R.E.M., Respondent pulled him away from his teacher, leading to an altercation that ended with Respondent and her brother fleeing the school in a grey car with R.E.M.

1    Once Respondent was in the United States, she contacted the FBI to alert them
2    that R.E.M. was again in her custody, and later informed the Mexican consulate of the
3    same. On March 3, 2023, Petitioner texted Respondent's brother, telling him that "the
4    cartel" was angry at them and looking for them. At the same time, Petitioner reported
5    Respondent's actions to local authorities in Los Barriles (in addition to the Island County
6    police and the State Department), and he testified that R.E.M.'s teacher initiated a
7    criminal case for abduction and assault.

8    Throughout 2023, the parties litigated their divorce, which included the issue of
9    custody of R.E.M., in Island County Superior Court. The Court appointed a guardian *ad*
10   *litem* to advocate for R.E.M.'s best interests and in a June 20, 2023 parenting plan,
11   ordered the parties to engage in psychological testing to address concerns related to
12   "personality, paranoia, and/or sociopathic traits." The Court granted custody of R.E.M. to
13   Respondent, and after an April 17, 2023 hearing at which both parties were present, the
14   Court prohibited Petitioner from contacting Respondent and granted Petitioner video
15   visitation of fifteen minutes three times per week. The Court gradually increased
16   Petitioner's visitation with R.E.M. throughout 2023, although the Court maintained
17   primary physical custody of R.E.M. with Respondent. Further, the Court ordered that
18   Petitioner pay child support to Respondent. In January 2024, Island County Superior
19   Court, noting that Petitioner had filed a Hague Petition in federal court, set in place a
20   temporary parenting plan, subject to modification pending the outcome of the Hague
21   Convention proceedings.

22   The temporary parenting plan provides that Respondent may make educational
23   and non-emergency healthcare decisions concerning R.E.M. and is the child's custodian.
24   The plan further provides that Petitioner has 43 percent of the overnight visits when he is
25   Western Washington, that all parenting time must take place within Western Washington,
26   and notes that Petitioner intends to spend time in both Washington and Mexico. The
27   Court found that both parents exhibit emotional or physical problems: Respondent has

anxiety and depression, and Petitioner exhibits conduct consistent with neurodiversity or an undiagnosed mental health issue. Further, the Court found that Petitioner engaged in an abusive use of conflict and an adversarial use of R.E.M.'s "international heritage." The Court noted that Petitioner took the child to Mexico without Respondent's consent at least in part to pressure Respondent to agree to more favorable terms in the dissolution of their marriage, and Respondent took inappropriate "self-help" measures to return R.E.M. to the United States. According to evidence submitted by Respondent, the Mexican court most recently declined to exercise jurisdiction over the parties' divorce and indicated that Island County Superior Court has jurisdiction. Petitioner states that he appealed this decision and that he expects for the parties' divorce to ultimately proceed in Mexico.

On October 30, 2023, Petitioner filed a Petition for Return of the Child to the State of Habitual Residence, Dkt. # 1, and Respondent filed her Answer on November 27, 2023. Dkt. # 10. A review of each party's pleadings and declarations revealed that the concurrent Island County Superior Court proceeding was ongoing, and this Court ordered Petitioner to provide a copy of the Island County docket and all court orders for review. Dkt. # 13. This Court granted Respondent's request for Spanish interpretation services at the Petition hearing. Dkt. #17. A hearing was conducted on March 28-29 and April 2, 2024 where both Petitioner and Respondent appeared in person, and Petitioner was represented by counsel. Petitioner, Respondent, Candice Jordan, and Carrie Whitney testified. The Court accepted various exhibits into evidence, including the parties' Mexican marriage license, Petitioner's Mexican permanent residence card, R.E.M.'s U.S. and Mexican birth certificates, photos of the Buena Vista house, and various communications between and including the parties.

### III. ANALYSIS

#### a. Jurisdiction and Burden of Proof

The Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11,670, 1343 U.N.T.S. 49 (the "Hague Convention" or the

"Convention"), was adopted in 1980 by the Fourteenth Session of the Hague Conference on Private International Law. The Convention's goal is "to secure the prompt return of children wrongfully removed to or retained in any Contracting State; and ... to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." Hague Convention, Art. 1. Both the United States and Mexico are signatories to the Convention. U.S. Department of State, Bureau of Consular Affairs, Hague Abduction Convention Country List, https://travel.state.gov/content/travel/en/International-Parental-Child-Abduction/abductions/hague-abduction-country-list.html (last visited April 17, 2024). The United States implemented the Convention through the enactment of the International Child Abduction Remedies Act (ICARA) (codified as amended at 22 U.S.C. §§ 9001-9011).

In drafting the Convention's provisions, the Conference attempted to address a particular type of "kidnapping" scenario: one in which a person, usually a parent, removes a child to, or retains a child in, a country that is not the child's habitual residence in order "to obtain a right of custody from the authorities of the country to which the child has been taken." Elisa Pérez–Vera, Hague Conference on Private International Law 428–29, ¶ 13 (1982) (hereinafter, "Pérez–Vera Report").[2] The Convention seeks to eliminate the motivation for such actions by requiring the court of the "requested State," or the country to which the child has been removed, to return a wrongfully removed or retained child to his or her country of habitual residence, unless the removing party establishes an exception or defense to return. Hague Convention, Art. 12.

---

[2] The explanatory report of Elisa Perez-Vera, the official Hague Conference reporter, is "recognized by the Conference as the official history and commentary on the Convention and is a source of background on the meaning of the provisions of the Convention available to all States becoming parties to it." Hague International Child Abduction Convention, Text and Legal Analysis, 51 Fed. Reg. 10494, 10503 (Mar. 26, 1986).

ORDER- 12

Unless and until there is a determination that the child need not be returned, "the judicial or administrative authorities of the Contracting State to which the child has been removed or in which it has been retained *shall not decide on the merits of rights of custody*." *Id.* Art. 16. Indeed, the "Hague Convention is generally intended to restore the pre-abduction status quo and to deter parents from crossing borders in search of a more sympathetic court." *Friedrich v. Friedrich (Friedrich II)*, 78 F.3d 1060, 1064 (6th Cir. 1996).

The key operative concept of the Convention is that of "wrongful" removal or retention. The removal or the retention of a child is to be considered wrongful where:

> a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
>
> b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Convention, Art. 3. The determination of the child's "habitual residence" is crucial, as "the Convention ordinarily requires the prompt return of a child wrongfully removed or retained away from the country in which she habitually resides." *Monasky v. Taglieri*, 589 U.S. 68, 72 (2020). The petitioner must establish a wrongful removal or retention by a preponderance of the evidence. *See* 22 U.S.C. § 9003(e)(1).

In the event that a petitioning party shows that the child was wrongfully removed or retained, Article 13 provides certain exceptions to the mandate that the child be returned to his or her habitual residence. Article 13(a) provides that the requested state is not bound to order the return of the child when it is shown by a preponderance of the evidence that the petitioner "was not actually exercising the custody rights at the time of removal or retention, or had consented to or subsequently acquiesced in the removal or

retention." Additionally, Article 13(b) contains an exception to mandatory return when a respondent can show by clear and convincing evidence that "there is a grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." *See* 22 U.S.C. § 9003(e)(2).

Although these exceptions or defenses are available, numerous interpretations of the Convention caution that courts must narrowly interpret the exceptions lest they swallow the rule of return. *See Friedrich II*, 78 F.3d at 1067 ("A federal court retains, and should use when appropriate, the discretion to return a child, despite the existence of a defense, if return would further the aims of the Convention").

In this case, the parties primarily dispute whether R.E.M.'s state of habitual residence is Mexico or the United States. Therefore, the Court must first consider this threshold question. With this framework in mind, we turn to the merits of Petitioner's request.

b.) Habitual Residence

The term "habitual residence" was intentionally left undefined in the Convention. *Holder v. Holder*, 392 F.3d 1009, 1015 (9th Cir. 2004). To avoid formalistic determinations, the Conference found that the question of whether a person is or is not habitually resident in a specified country is a question of fact to be decided by reference to all the circumstances of the particular case. *Id.* Determination of the child's habitual residence is the "central—often outcome-determinative—concept on which the entire system is founded." *Asvesta v. Petroutsas*, 580 F.3d 1000, 1017 (9th Cir. 2009) (citing *Mozes v. Mozes*, 239 F.3d 1067, 1072 (9th Cir. 2001), *abrogated on other grounds by Monasky*, 589 U.S. 68).

A child's residence in a country may be deemed "habitual" when it is "more than transitory." *Monasky*, 589 U.S. at 77. The Court must consider "the family and social environment in which [the child's] life has developed," because a child's residence becomes "habitual" when there is "some degree of integration by the child in a social and

family environment." *Id.* (citing the Pérez–Vera Report at 428 ¶ 11). For children old enough to acclimatize to their surroundings, "facts indicating acclimatization[3] will be highly relevant." *Id.* at 78. As a part of this "fact-driven inquiry," the Court must "be sensitive to the unique circumstances of the case and informed by common sense." *Id.* at 78 (quoting *Redmond v. Redmond*, 724 F.3d 729, 744 (7th Cir. 2013)). Notably, the Convention does not require that a child's habitual residence depend upon an actual agreement between the child's parents. *Id.* at 77.

Petitioner alleges that R.E.M. was wrongfully retained in Washington starting from approximately July 1, 2022 until January 3, 3023, when Petitioner flew with R.E.M. back to Mexico. Dkt. # 1 ¶¶ 3.123, 3.124. The evidence before the Court shows that prior to July 2022, R.E.M. lived in the United States from June 2019 to September 2019; in Mexico from August 2019 to June 2020, from the United States from July 2020 to November 2021, and from Mexico from December 2021 to May 2022. Petitioner's allegations are predicated on R.E.M.'s habitual residence in July 2022 being Mexico. However, Petitioner has not established this required factor by a preponderance of the evidence.

From R.E.M.'s birth until 2022, the family see-sawed between Mexico and the United States. At most, the parties appear to have sought an international lifestyle, with a home in Buena Vista that could at times be used to bring in AirBnB income, a property in Washington, and even another potential home elsewhere in the Western United States. Although Petitioner argues that the parties wanted to settle in Mexico (and specifically, for R.E.M. to live in Mexico) to solidify his language skills, given the parties' American and Mexican backgrounds, it would be appropriate for R.E.M. to be raised in a bilingual

---

[3] Such facts may include the child's age, the immigration status of the child and parents, the child's academic activities, social engagements, participation in sports, meaningful connections with people and places in the child's new country, language proficiency, and the location of the child's personal belongings. *Monasky*, 589 U.S. at 78 n.3.

fashion and to spend ample time in Mexico near his maternal grandparents. Because of the discord that characterized the parties' relationship, this Court cannot look to the shared intentions of the parties to determine R.E.M.'s habitual residence. Here, the parties were rarely in agreement as to where they ultimately wanted to settle down. R.E.M. was born in Washington, Petitioner claims Mexico as his state of residence, and Respondent has preferred to settle in Washington. Petitioner's actions in particular reflected ever-shifting goals: at varying times, Petitioner appeared to desire to settle in Mexico, several towns within Washington, Idaho, Oklahoma, or even Costa Rica. Further, witness testimony shows that Petitioner's behavior in 2022 was somewhat erratic, raising alarm bells such that Petitioner's mother shared the number to a crisis hotline with Respondent.

      However, it is clear that whether or not the parties intended their June 2022 trip to Washington last only two weeks (or perhaps only for the summer), the parties' actions reveal that their intentions changed and solidified during that time frame. Although Respondent contacted the Whidbey Island Children's Center about enrolling R.E.M. for the summer of 2022, the child remained in school there until January 2023, when Petitioner took the child to Mexico. Both parties testified to R.E.M.'s social connections in both Washington and Mexico; however, the Court notes that the majority of the child's school and medical connections are within Island County. In September and October 2022, Petitioner shared with Respondent house listings in Oak Harbor and Clinton, Washington; Austin, Pflugerville, and Round Rock, Texas; and Garden City, Idaho. Based on the credible testimony of Respondent, the parties' plan to build their dream house on the Freeland lot remained in the background as well. Even assuming that the parties agreed to make Buena Vista their home (while at the same time looking for homes in the Western United States), "any such agreement is not dispositive of the habitual residence question after the Supreme Court's decision in *Monasky*." *Chvanov v. Chvanova*, No. 8:23-cv-00867-FWS-KES, 2023 WL 6457787, at * 4 (C.D. Cal Oct. 3,

2023) (parties' alleged agreement to move to Mexico was not dispositive of habitual residence question when Petitioner failed to adequately demonstrate that the parties intended to move to Mexico or submit evidence that child was at home in Mexico).

Further, the Court credits Respondent's testimony concerning coercion on the part of Petitioner. During the hearing, Petitioner reiterated several times that the parties' Mexican marriage would not provide for property distribution between the parties, alluding to a level of financial imbalance and control between the parties that Petitioner leveraged against Respondent. Respondent's statements underscore this dynamic. Respondent testified that she understood that her name was not on the house in Buena Vista or the land in Freeland, Washington. She also testified that she had little knowledge of the parties' finances, but signed whatever documents Petitioner told her to because she loved and trusted him and did not want him to believe that she married him only for his money. Respondent did note that, through the relevant time periods, Petitioner continued to file taxes in the United States and use his mother's Island County address as needed despite expressing a desire to go back to Mexico. Petitioner's withholding of Respondent's, R.E.M.'s, and even D.D.M.'s school, travel, and vaccination documents further speaks to coercion by Petitioner.

Given that "parents will not agree about what their shared intentions were once litigation is underway," the Court must "take account of the parents' actions as well as what they say." *Norinder v. Fuentes*, 657 F.3d 526, 534 (7th Cir. 2011). Here, the parties' actions showed their intentions to stay in Washington in June 2022 longer than two weeks. R.E.M.'s acclimatization, reflected in his ongoing school enrollment and community and medical connections, further establishes his habitual residence in Washington. *Mozes*, 239 F.3d at 1082 (acclimatization has occurred when a child has no habitually established residence elsewhere, and the child may become habitually resident even in a place where it was intended to live for only a short period of time). Prior to Summer 2022, the parties had not established R.E.M.'s habitual residence in Mexico,

preferring to move back and forth between Mexico and the United States during the child's infancy. However, due to marital discord or a desire to maintain roots in Washington, the parties took actions to solidify R.E.M.'s connection to Washington and acclimatize him to Island County, specifically. Here, the evidence before this Court points to R.E.M.'s ordinary residence being in Washington, such that R.E.M.'s retention in Washington in July 2022 to January 2023 was not wrongful.

Neither does this Court find Respondent's removal of R.E.M. from Mexico on March 2, 2023 to be wrongful under the narrow confines of the Convention, because R.E.M.'s habitual residence had not been established in Mexico at that time. The Court is clear that it does not condone the self-help methods utilized by Respondent when she went to R.E.M.'s Mexican school and removed him. However, this Court must also note that Petitioner took R.E.M. to Mexico on January 3, 2023 without the agreement of Respondent and in violation of the temporary restraining order issued by Island County Superior Court on December 28, 2022. It appears that Petitioner took care to avoid being served directly while in the United States and testified that he had no memory of discussing Respondent's divorce filing, even though the parties spent the Christmas and New Year's holidays together. In any event, the parties admittedly communicated about R.E.M. throughout January and February 2023, and Petitioner retained counsel on January 25 to respond to the divorce petition and object to Island County's authority to decide the parties' divorce. Although R.E.M. remained in Mexico during this time, this Court does not find that R.E.M.'s prior habitual residence in Washington was abandoned in place of Mexico in early 2023.

Because Petitioner has failed to establish, by a preponderance of the evidence, that Mexico was R.E.M.'s habitual residence in either July 2022 or March 2023, no further analysis of the alleged date of wrongful removal or Respondent's grave risk defense is necessary.

## IV. CONCLUSION

Based on this Court's finding that R.E.M.'s habitual residence is the United States, Petitioner has not made the required showing under the Hague Convention that R.E.M. is required to be returned to Mexico. Therefore, the Petition is **DENIED**. Dkt. # 1.

DATED this 23rd day of April, 2024.

*Richard A. Jones*
_____
The Honorable Richard A. Jones
United States District Judge