1          UNITED STATES DISTRICT COURT

2       WESTERN DISTRICT OF WASHINGTON AT SEATTLE

3   _____
                                 )
    In re the Application of:     ) CV23-01655-RAJ
4                                 )
    RYAN NEIL MORRISON,           ) SEATTLE, WASHINGTON
5                                 )
                    Petitioner,   ) March 28, 2024 -
6                                 ) 1:30 P.M.
    v.                            )
7                                 )
    FANY DAMIAN CHANG,            ) EVIDENTIARY HEARING -
8                                 ) Day 1 of 3
                    Respondent.   )
9   _____

10  _____

11           VERBATIM REPORT OF PROCEEDINGS
         BEFORE THE HONORABLE RICHARD A. JONES
12            UNITED STATES DISTRICT JUDGE
    _____

13

14  APPEARANCES:

15  For the Petitioner:      Robert Carl Bennett
                             Michael Bungi & Associates
16                           11300 Roosevelt Way N.E.
                             Suite 300
17                           Seattle, WA 98109

18

19  For the Respondent:      Fany Damian Chang Morrison
                             Self-Represented Litigant
20                           P.O. Box 702
                             Langley, WA 98260

21

22

23

24

25

Proceedings stenographically reported and transcript produced with computer-aided technology

1                          EXAMINATION INDEX

2      EXAMINATION OF                                        PAGE

3      RYAN NEIL MORRISON      DIRECT EXAMINATION            13
                              MR. BENNETT
4                             CROSS-EXAMINATION             75
                              BY MS. CHANG MORRISON
5                             REDIRECT EXAMINATION          80
                              BY MR. BENNETT
6      CANDACE JORDAN         DIRECT EXAMINATION            82
                              BY MR. BENNETT
7                             CROSS-EXAMINATION             85
                              BY MS. CHANG MORRISON

8

9

10                            EXHIBIT INDEX

11

12     EXHIBITS ADMITTED                                    PAGE

13     1                                                    17
       2                                                    16
14     3                                                    18
       4                                                    19
15     5                                                    40
       6                                                    43
16     7                                                    63
       8                                                    65
17     10                                                   68
       11                                                   69
18     12                                                   71
       14                                                   58
19     19                                                   36
       20                                                   34
20     23                                                   60
       24                                                   28
21     26                                                   73
       27                                                   24
22     29                                                   75
       30                                                   53

23

24

25

1          THE COURT:  Good afternoon.  Please be seated.

2          THE CLERK:  We are here for an evidentiary hearing in

3    the matter of the Ryan Neil Morrison versus Fany Damian Chang,

4    Cause No. C23-1655, assigned to this court.

5      If counsel for the petitioner and for respondent and our

6    standby interpreter could all please rise and make your

7    appearances for the record?

8          MR. BENNETT:  Good afternoon, Your Honor.  My name is

9    Robert Bennett.  I represent Petitioner Ryan Morrison, who is

10   standing to my left.

11         THE COURT:  Good morning to both of you -- or good

12   afternoon.  Please be seated.

13         MS. CHANG MORRISON:  Good afternoon.  My name is Fany

14   Morrison, and I'm representing myself.

15         THE COURT:  All right.  Good afternoon to you as well.

16   Before we begin, I would like to identify the ground rules and a

17   few operational issues.  First of all, you will note that there

18   is a woman that is seated in the jury box.  Perhaps my courtroom

19   deputy explained to you that she is job shadowing our court

20   reporter so that she can increase her skills and increase her

21   opportunity to serve as a court reporter in the future.  Hers is

22   not an official record or transcript of proceedings; the only

23   official record and transcript of proceedings will be by the

24   court reporter who is authorized and certified by this court.

25      Second, today's proceeding will begin today at 1:30 and will

1    go to 3:30, and we can push perhaps to 3:45.  If necessary, we

2    will resume tomorrow morning, and we will operate from 9:00 until

3    11:00.  The court has a sentencing proceeding at eleven o'clock

4    tomorrow to noon.  We will break from noon until 1:30, and then

5    we will resume this case tomorrow afternoon at 1:30.  Again, this

6    all depends on the progress of this case.

7        Now, I wish to confirm and verify for the parties, I have

8    read all of the pleadings that you submitted.  The court received

9    the respondent's exhibits today, but they were referenced quite

10   frequently in the materials provided to this court, all of which

11   I have read.

12       Now, the purpose of today's hearing is the petitioner seeks

13   return of the child to Mexico, and this will be conducted

14   pursuant to the Hague Convention operating rules and procedures.

15   I understand, clearly, based upon the relief identified by the

16   petitioner, what he is seeking in this matter, but I wish to

17   clarify also that we will operate in the following manner.

18   First, the sole basis for this court's jurisdiction is the

19   International Child Abduction Remedies, which is the United

20   States statute that implements the Hague Convention.  At this

21   stage, the court will not be addressing or resolving any issues

22   regarding custody or modification of custody orders or issues.

23   Oftentimes parties come to a court pursuant to the Hague

24   Convention and they have outstanding or collateral issues

25   regarding child custody.  That will not be addressed by this

1    court.  Any relief that you wish in that regard needs to return

2    to either of the jurisdictions where there are currently pending

3    custody matters.

4        The court will proceed as follows.  The petitioner will

5    proceed first.  My understanding is the witnesses for the

6    petitioner are himself and one other witness.  And that the court

7    wishes to affirm that the burden is on the petitioner to show by

8    a preponderance of the evidence that removal was wrongful.

9        Now, I'll identify for the benefit of the parties the key

10   issues the court is looking towards, and that's, one, when did

11   the removal or retention take place; two, immediately before

12   removal or retention, in which state was the child habitually

13   resident; three, did the removal or retention breach the rights

14   of custody under the law of habitual residence; and, four, was

15   the petitioner exercising those rights at the time of removal or

16   retention.

17       Now, the respondent will then proceed, and she must establish

18   by clear and convincing evidence that grave risk would exist if

19   the child was returned to the petitioner and would expose the

20   child to harm or psychological challenges; second, that the

21   return of the child would not be permitted by the fundamental

22   principles of the requested state relating to the protection of

23   human rights and fundamental process.  And she's identified

24   herself and one other witness to testify.

25       Now, it's my understanding that the respondent in this case,

1  Ms. Chang, has an interpreter.  I want you to know that you have

2  the freedom to consult with your interpreter anytime you don't

3  understand anything that I have said or the moving party in this

4  case.  That's not an interruption of the court.  If you need to

5  take a short recess or consult with the interpreter, just merely

6  raise your hand and get the court's attention, and that way I can

7  make sure you're paying attention to what's being said and not

8  interrupted by trying to have a better understanding of what's

9  taking place.

10      Do you have any reason to believe that you can't interrupt

11  or feel free to interrupt by raising your hand if you need to

12  consult with the interpreter?

13          MS. CHANG MORRISON:  Thank you, Your Honor.

14          THE COURT:  All right.

15      Also, I'll require that the parties speak clearly into the

16  microphone, if you are making argument.  I will also direct that

17  if you wish to make communication with the court, you step to the

18  lectern, pull the microphones to you, and address the court from

19  that location.

20      Counsel for the petitioner has his own lawyer, so the lawyer,

21  I trust, obviously understands what this court's expectations

22  would be by asking your client questions from the witness box.

23  Also, cross-examination will take place.  So after the petitioner

24  testifies, he may be or will be subject to cross-examination by

25  the respondent, and the same would apply that when the respondent

 1    begins her testimony, or her witnesses, they'd also be subject to

 2    cross-examination.

 3        I think I have identified what the expectations will be for

 4    the operation of this court proceeding.  Before we begin, are

 5    there any questions about procedure, first by counsel for the

 6    petitioner?

 7            MR. BENNETT:  Thank you, Your Honor.

 8        So I have to ask my questions of the witness at the podium?

 9            THE COURT:  Yes.

10            MR. BENNETT:  And then ask permission to approach?

11            THE COURT:  Yes.

12            MR. BENNETT:  And then is permission ongoing after the

13    first request?

14            THE COURT:  Yes.

15            MR. BENNETT:  Okay.  Those are my questions, Your Honor.

16            THE COURT:  Okay.  Any procedural questions or

17    operational questions by the respondent?

18            MS. CHANG MORRISON:  No.  Thank you.

19            THE COURT:  Okay.  Then let's begin.

20        Counsel.

21            MR. BENNETT:  Thank you, Your Honor.  Beginning with

22    opening statements?

23            THE COURT:  Briefly.

24            MR. BENNETT:  Okay.

25            THE COURT:  Again, counsel, it's not necessary to give

 1  this court an exhaustive statement and an oral statement to the

 2  court because I have read everything.  So I would encourage you

 3  to hit the high points and move from there.

 4      MR. BENNETT:  Thank you, Your Honor.

 5  So the evidence in this case is going to show that the

 6  parties are married and that they're in the process of divorcing.

 7  The parties married in November 2016 in Mexico.  The parties are

 8  the natural parents of R.E.M., who's born in June 2019 in

 9  Anacortes, Washington.

10      THE COURT:  Counsel, slow down.  We have got a court

11  reporter.

12      MR. BENNETT:  Oh, okay.  Sorry.

13      THE COURT:  Just take your time and pull the microphone

14  closer to you.

15      MR. BENNETT:  Okay.

16  So the evidence will show that the respondent is also the

17  mother of D.D.M., whose natural father resides in Mexico.  D.D.M.

18  resides with the respondent in Washington; however, D.D.M. is not

19  at issue in this case.

20      Both parties and the child are legally authorized to live in

21  Mexico.  Petitioner has a permanent residence in Mexico.

22  Respondent and the child are citizens of Mexico.  So the

23  petitioner asks the court to order that R.E.M. be returned to

24  Mexico from Washington State, pursuant to the Hague Convention.

25      The evidence will show that the child's habitual residence is

1   Buena Vista, Baha California Sur, Mexico.  The petitioner owns a

2   home in Buena Vista, Mexico, where the child has lived for

3   approximately 19 months with one or both parents.

4        In May 2023 {sic}, the parties left Buena Vista with their

5   child to look at potential summer homes located in Idaho,

6   Colorado, and Oklahoma.  The evidence will show the parties found

7   nothing suitable on their trip.  The respondent requested that

8   the parties visit the petitioner's relatives in Island County,

9   Washington, before returning to Buena Vista.  Petitioner agreed

10  to the visit, but only for a few weeks, and the parties arrived

11  in Island County in June 2022.  The evidence will show that the

12  length of the visit just kept getting longer and longer, at the

13  respondent's request and over the petitioner's objections.  The

14  parties had agreed to return to Buena Vista with their child

15  after the two-week visit to Island County, but the respondent

16  attempted to change the terms of the parties' agreement to return

17  to Buena Vista.  For example, she offered that she would stay in

18  Island County with her oldest son, D.D.M., for the 2022/23 school

19  year, and then petitioner would return to Buena Vista with R.E.M.

20  and enroll him in school for the 2022/2023 school year in Buena

21  Vista, Mexico; however, the respondent continued changing the

22  terms of the agreement, and the petitioner was adamant that the

23  parties return to Buena Vista as a family.

24       The evidence will show that in December 2022, the respondent

25  moved with the child from the home in which the parties were

1  temporarily staying, which was the petitioner's mother's home,

2  and that would be Ms. Candace Jordan, to a permanent residence

3  that she had rented in the area.  The petitioner was in Mexico at

4  the time that the respondent moved.  The evidence will show the

5  respondent did not notify the petitioner of her move or

6  her intent --

7          THE COURT:  Counsel, counsel, counsel, I know you are

8  reading, but you are reading extremely fast.  Please slow down if

9  you wish an accurate record of the proceedings taking place.

10         MR. BENNETT:  Will do, Your Honor.  Thank you.  Yeah.

11    So the respondent did not notify the petitioner of her move

12  or even her intent to move to a permanent residence in the Island

13  County area.  The petitioner found out about the respondent's

14  move when he returned to Island County from Mexico in December of

15  2022.

16    The one-year period for a wrongful retention should begin at

17  this point, in December 2022, because this is the point at which

18  it became clear to the petitioner that the respondent had no

19  intention of returning to Buena Vista with her husband and the

20  child and that it was her intention to retain the child in Island

21  County, Washington.

22    The evidence will show that on January 3rd, 2023, the

23  petitioner returned to Buena Vista with R.E.M. and that the

24  respondent had agreed to this return; however, the respondent

25  again began changing the terms of the return agreement, and the

1     petitioner refused to accommodate her changes.

2         The evidence will show that on March 2nd, 2023, the

3     respondent, Fany Chang, took matters into her own hands, went to

4     Mexico, and wrongfully removed R.E.M. from his habitual residence

5     in Buena Vista, Mexico.  The evidence will show that removal was

6     in breach of the petitioner's custody rights under Mexican law

7     and that the petitioner was exercising his custody rights at the

8     time that the child was unlawfully removed from Mexico.  The

9     evidence will also show that the respondent cannot maintain any

10    of the Hague Convention's affirmative defenses by clear and

11    convincing evidence.

12        The evidence will show that the child's habitual residence

13    immediately before the retention was Buena Vista, Mexico, and it

14    was also the child's habitual residence when the child was

15    wrongfully removed from Buena Vista, Mexico.  As I said, the

16    parties owned a house in Buena Vista, where most of their

17    personal belongings were kept.  The child lived in Buena Vista

18    with one or both parents for approximately 19 months.  The

19    child's maternal grandparents live nearby.  The child has

20    relationships with other relatives and family and friends there

21    as well.

22        The parties never mutually intended to move to or remain in

23    Island County, Washington, and the parties' intent before

24    visiting Whidbey Island, Washington, in the summer of 2022, was

25    to return home to Buena Vista.

1      Thank you, Your Honor.

2           THE COURT:  All right.  Thank you.

3      Ms. Chang, do you wish to make an opening statement?  You are

4  not required to, but this is your opportunity.  If there are

5  preliminary arguments -- or preliminary statements of what the

6  evidence will show, this would be your chance to do so.

7           MS. CHANG MORRISON:  Yes.

8      I would like to say that I have never given permission to

9  take E█████, ever, to Mexico.  I don't understand why they're

10  calling that retention of E█████ since June 2022 in the U.S. is

11  a retention.  We both agreed to come.  We both enrolled E█████

12  to school.  Ryan made offers to buy properties on the island.  So

13  I don't understand that part.

14      When I went to Mexico --

15           THE COURT:  Ms. Chang, this is opening statement.  You

16  will have a chance to testify.  I just want to make sure you

17  understand that there's a difference between opening statement,

18  which means this is what I plan to show by evidence.  You will be

19  able to testify, have your witness testify, and then you will be

20  able to make argument at the end of the entire case.  I just want

21  to make sure you understand the difference.

22           MS. CHANG MORRISON:  Thank you.  Sorry.

23           THE COURT:  That's fine.

24           MS. CHANG MORRISON:  I just wanted to say that I never

25  gave permission to take E█████, and I am going to prove that

1   there were Island County orders that gave me custody and actually

2   was preventing for E█████ to change his habitual residency when

3   that happened and he was living at my place.

4       Thank you.

5           THE COURT:  Okay.  Thank you.

6       Counsel, call your first witness.

7           MR. BENNETT:  Thank you, Your Honor.

8       The petitioner calls Ryan Morrison.

9           THE COURT:  Please step forward, sir, and be placed

10  under oath.

11          THE CLERK:  Just stop there for a minute.

12                      RYAN NEIL MORRISON,

13      having been sworn under oath, testified as follows:

14          THE CLERK:  Please have a seat.

15      If you could please state your first and last names and spell

16  your last name for the record.

17          MR. MORRISON:  Sure.  My name is Ryan Neil Morrison, and

18  my last named is spelled M-o-r-r-i-s-o-n.

19          THE COURT:  You may inquire.

20          MR. BENNETT:  Thank you, Your Honor.

21                      DIRECT EXAMINATION

22  MR. BENNETT:

23  Q   Mr. Morrison, are you married?

24  A   Yes.

25  Q   To whom?

 1   A   To the respondent, Chang.

 2   Q   All right.  The respondent in this case?

 3   A   Yes.

 4   Q   Are you in the process of a divorce?

 5   A   Yes.

 6   Q   Describe that process.

 7   A   I initially filed for divorce in November of 2022, then

 8   Respondent Chang filed for divorce December 28, '22, and then I

 9   changed the venue, updated our divorce in Mexico, January 24th,

10   2023.  And they're all ongoing.

11   Q   All right.  When you filed the divorce in November of 2022,

12   where did you file?

13   A   San Jose in Los Cabos, in Mexico.

14   Q   Okay.  Why did you do that?

15   A   I'm sorry.  In Cabo San Lucas.

16       Pardon?

17   Q   Why did you file for divorce?

18   A   We had been having marital issues for quite some time.  The

19   worst of those issues were when we came to Whidbey Island for a

20   two-week visit, and Respondent Chang decided not to leave.  And,

21   in particular, the last agreement we'd had before filing for

22   divorce was that she was going to stay for the school year with

23   her son on Whidbey Island while R.E.M. and I would go home.  I

24   bought tickets for us to go home, and she refused to let us go.

25   And I think that was a point in time when I knew that there was

1   really no chance for us to continue with the marriage, so I went

2   home and filed for divorce.

3   Q   All right.  And when did you and Ms. Chang get married?

4   A   That was November 25th, I believe, 2016.

5   Q   Okay.

6       MR. BENNETT:  Your Honor, permission to approach the

7   witness?

8       THE COURT:  You may.

9   Are you showing exhibits to the witness, counsel?

10      MR. BENNETT:  Yes, Your Honor.

11      THE COURT:  I have the exhibit list, so if you make

12  reference to the exhibit --

13      MR. BENNETT:  Oh, okay.

14  A   And I have a --

15      THE CLERK:  He has a set, yes.

16  Q   All right, Mr. Morrison.  Please turn your attention to

17  Exhibit No. 2.  And do you recognize Exhibit No. 2?

18  A   Yes.

19  Q   What is it?

20  A   This is our marriage certificate from Mexico.

21  Q   All right.  And where were you married in Mexico?

22  A   Playa del Carmen.

23  Q   What year?

24  A   2016.

25  Q   And is this, Exhibit No. 2, a true and accurate copy of your

 1   marriage certificate?

 2   A   Yes.

 3           MR. BENNETT:  Your Honor, I would move to admit Exhibit

 4   No. 2.

 5           THE COURT:  Any objection, Ms. Chang?

 6           MS. CHANG MORRISON:  No.

 7           THE COURT:  All right.  Exhibit 2 is admitted.

 8                   (Exhibit No. 2 admitted.)

 9   Q   All right.  And do you have any children of your marriage?

10   A   Yes.

11   Q   Who is that?

12   A   R.E.M.

13   Q   All right.  And how old is R.E.M. right now?

14   A   Four and a half.

15   Q   And when was he born?

16   A   June 13th, 2019.

17   Q   Where was he born?

18   A   Anacortes.

19   Q   Why was he born there?

20   A   Well, we were in Mexico during the pregnancy, but we both

21   wanted to have dual citizenship for our son, so we came back to

22   Washington specifically for the birth.

23   Q   All right.  So please refer to Exhibit No. 1, Mr. Morrison.

24   Do you recognize Exhibit No. 1?

25   A   I do, yeah.  This is R.E.M.'s birth certificates, both in the

1    U.S. and in Mexico.

2    Q    Why does he have a Mexican birth certificate?

3    A    Well, we wanted him to have dual citizenship, so a few weeks

4    after his birth, we went back to Mexico and we did what's called

5    an insertion of birth certificate, so that he could have the

6    birth certificate with two versions, both one that was valid in

7    the U.S. and one that was valid in Mexico.

8    Q    And what was the purpose of that?

9    A    To make him a dual citizen, so he would have his Mexican

10   citizenship, and he could reside there, you know, permanently, if

11   he wished.

12   Q    And is Exhibit No. 1 a true and accurate copy of the Mexican

13   and U.S. birth certificates?

14   A    Yes.

15             MR. BENNETT:  Your Honor, I move to admit Exhibit No. 1.

16             THE COURT:  Any objection?

17             MS. CHANG MORRISON:  No, Your Honor.

18             THE COURT:  Exhibit 1 is admitted.

19                     (Exhibit No. 1 admitted.)

20   Q    All right.  And are you legally authorized to live in Mexico?

21   A    Yes, I am.  I have permanent residency in Mexico.

22   Q    How did you attain that?

23   A    I believe originally it was through my marriage through

24   Respondent Chang.  It started off as temporary residency, and

25   after, I believe, three years or so, I was able to apply for

 1  permanent residency.

 2  Q   Okay.  And do you still hold permanent residency in Mexico?

 3  A   I do.

 4  Q   Please turn to Exhibit No. 3.  And do you recognize Exhibit

 5  No. 3?

 6  A   Yes.

 7  Q   What is it?

 8  A   This is the insertion of my son's birth certificate in

 9  Mexico.

10  Q   Okay.  So this is paperwork that you had to complete to get

11  your son the birth certificate?

12  A   Correct.

13  Q   The Mexican birth certificate?

14  A   Correct.

15  Q   Okay.  Is it a true and accurate copy of that document?

16  A   Yes.

17          MR. BENNETT:  Move to admit Exhibit No. 3, Your Honor.

18          THE COURT:  Any objection?

19          MS. CHANG MORRISON:  No, Your Honor.

20          THE COURT:  Three is admitted.

21                  (Exhibit No. 3 admitted.)

22  Q   Please turn to Exhibit No. 4.  And do you recognize Exhibit

23  No. 4?

24  A   Yes.

25  Q   What is it?

 1    A    This is my permanent resident card in Mexico.

 2    Q    All right.  Is that a -- who issued you that document?

 3    A    This was issued in Cabo San Lucas in BCS, Mexico.

 4    Q    And is there any reason why it was issued there?

 5    A    Because that's the closest location where they issue these to

 6    our home in Buena Vista.

 7    Q    And is Exhibit No. 4 a true and accurate copy of your

 8    permanent residence permit in Mexico?

 9    A    Yes.  Yes.

10         MR. BENNETT:  Your Honor, I would move to admit Exhibit

11    No. 4.

12         THE COURT:  Four is admitted.

13                   (Exhibit No. 4 admitted.)

14         THE COURT:  And, counsel, a reminder again, some of the

15    questions that you are asking in your offer of admission, your

16    words are stringed together.  It makes it difficult for the court

17    reporter to get an accurate record.

18         MR. BENNETT:  Okay, Your Honor.  I'll do my best to slow

19    down.

20    Q    Does Ms. Chang have another son?

21    A    She does, yes.

22    Q    Is that D.D.M.?

23    A    Yes.

24    Q    All right.  How old is that child?

25    A    I believe he's 14 now.

1    Q    And who is the father?

2    A    The father's name is Miguel Angel Ledezma Rubalcava.

3    Q    All right.  And have you met Mr. Rubalcava?

4    A    Yes.

5    Q    How have you met him?

6    A    Oh, I met him when we were living together originally in

7    Playa del Carmen.  We were out of contact for some time, but I've

8    also have been in contact with him recently.

9            THE COURT:  Counsel, so we have an accurate record,

10   could you have the witness spell the father of the other child's

11   name?

12           MR. BENNETT:  Thank you, Your Honor.

13   Q    Please spell the father of the other child's last name.

14   A    Sure, I would be happy to.  Just give me one second, so I

15   make sure I can get it right.

16       Here we go.  M-i-g-u-e-l, A-n-g-e-l, L-e-d-e-z-m-a,

17   R-u-b-a-l-c-a-v-a.

18   Q    All right.  And you testified earlier that you had met

19   Mr. Rubalcava recently?

20   A    Yes.  He came to Washington looking for his son, who he

21   hasn't seen for seven years.

22   Q    And why has Mr. Rubalcava not seen his son in seven years?

23   A    Respondent Chang falsified a second birth certificate for her

24   son, removing the father and changing the son's name, and she's

25   used that to keep her son isolated from the father for many years

1    during his childhood and, most recently, for the past seven

2    years.

3    Q    All right.  Please turn your attention to Exhibit 27.  Do you

4    recognize Exhibit No. 27?

5    A    Yes.

6    Q    What is it?

7    A    This was the location of R.E.M. since his birth.

8    Q    And do you know who made this document?

9    A    Yes.  I made this document.

10   Q    How did you make it?

11   A    Mostly looking through pictures on my phone to get dates of

12   where we were at different locations.

13   Q    Okay.  And when did you make this document?

14   A    Maybe about six months ago.

15   Q    All right.  And is it accurate as to -- or with regard to

16   your son's locations during those time periods?

17   A    Yes.

18          MS. CHANG MORRISON:  Excuse me.

19          THE COURT:  Yes.

20          MS. CHANG MORRISON:  I need to -- I need some

21   translation.

22          THE COURT:  Certainly.

23             (The interpreter and Ms. Chang confer.)

24          THE INTERPRETER:  Counsel, for the interpreter's

25   clarification, were you asking the witness when this document was

1   made?

2           THE COURT:  Oh.  First of all, any clarification or

3   interpretation should take place between you and Ms. Chang.  If

4   there's communication with counsel, that needs to be a matter of

5   record in the court.  The questions you have are directed to me

6   and not of questions to counsel.

7           THE INTERPRETER:  Apologies from the interpreter, Your

8   Honor.  This is a new role for the interpreter.

9           THE COURT:  That's fine.

10          THE INTERPRETER:  Standby, it's not a normal occurrence,

11  so --

12          THE COURT:  That's fine.

13          THE INTERPRETER:  -- apologies from the interpreter.

14          THE COURT:  No.  That's fine.  I just want to make sure

15  everybody understands the procedures.

16          THE INTERPRETER:  Sorry.  Respondent was asking for

17  clarification, whether the attorney --

18          MS. CHANG MORRISON:  The question.  He asked a question.

19  I didn't hear the question or understand what he was asking about

20  this exhibit.

21          THE COURT:  So you are asking counsel to rephrase the

22  question?

23          MS. CHANG MORRISON:  Please.

24          THE INTERPRETER:  Yes.

25          THE COURT:  Counsel, could you rephrase the last

 1    question?

 2             MR. BENNETT:  Yes, Your Honor.

 3    Q    Do you recall when you made this document that's Exhibit

 4    No. 27?

 5    A    Yeah.  As I mentioned, this document, I made approximately

 6    six months ago.

 7    Q    And did you refer to anything to make this document?

 8    A    Yeah.  It was primarily based on photos on my phone, with

 9    dates.

10    Q    Did you consult the metadata for the photos?

11    A    Yes.

12    Q    All right.  And, in your opinion, is this a true and accurate

13    representation of where your son was located during the time

14    periods --

15    A    Yes.

16    Q    -- listed on the document?

17    A    Yes.

18             MR. BENNETT:  Your Honor, I would move to admit Exhibit

19    No. 27.

20             THE COURT:  Any objection?

21             MS. CHANG MORRISON:  Well, I am not able to verify the

22    dates, of course.  Like, we'll have -- I will need time to check

23    the dates.

24             THE COURT:  Well, right now the only question is, do you

25    have objection to the document coming in for the court's

1  consideration?  You will have a chance at the end of today's

2  proceedings to review the document.  But right now, are you

3  questioning the admissibility of the document?

4          MS. CHANG MORRISON:  No, Your Honor.

5          THE COURT:  All right.  27 is admitted.

6                  (Exhibit No. 27 admitted.)

7  Q   All right.  And your son, R.E.M., was born in June of 2019?

8  A   Correct.

9  Q   All right.  And did you return to Mexico after your son was

10 born?

11 A   Yes, after approximately, I believe, eight weeks.

12 Q   Okay.  And then where in Mexico did you go?

13 A   Well, we flew into Mexico City.  Unfortunately, Respondent

14 Chang was detained temporarily due to the abduction of her son

15 D.D.M.  Eventually, we continued on to Chiapas.  We spent time

16 with her parents, picked up our car and all the rest of our

17 household belongings we had left there, and eventually drove to

18 our home in Buena Vista.

19 Q   Do you own a home in Buena Vista?

20 A   Yes.

21 Q   Are you the sole owner?

22 A   I'm the sole owner.  And the beneficiary, if I was to pass

23 away, would be Respondent Chang.

24 Q   Okay.  And did you purchase the home?

25 A   Yes.

1    Q    When did you purchase it?

2    A    That was in March of 2019.

3    Q    And how did you purchase it?

4    A    With cash.

5    Q    So after your son was born in Anacortes, was it both parties'

6    intent to return to Mexico with your son and live in Mexico?

7    A    Yes.

8    Q    All right.  And then how long were you in Mexico after you

9    returned?

10   A    I think it was about ten months until just after R.E.M.'s

11   first birthday.  I think maybe July.

12   Q    All right.  And then after those ten months, did you return

13   with your son to the United States?

14   A    Yes.

15   Q    When did you do that?

16   A    Yeah, that was July of 2020.

17   Q    Why did you do that?

18   A    We had a home as well on the island, and we were back at

19   least for the summer.

20   Q    Okay.  So you owned real estate in Island County as well?

21   A    Yes.

22   Q    Okay.  And how long had you owned that real estate?

23   A    I had purchased that property in December of 2017.

24   Q    Okay.  And so your intent was to come back for the summer to

25   Island County?

 1   A    Yeah, the summer.  Yeah, at least for the summer.

 2   Q    Okay.  And did you have anyone occupying the house when you

 3   returned?

 4   A    We did.  At that point in time, we had rented our house to

 5   friends, and I think we were planning at that point in time to be

 6   coming back at least for summers.  I don't know exactly what our

 7   arrangements were going to be, but possibly would have found some

 8   way to share the home with them or bounce around the island with

 9   family.  But then it looked like we would be coming back for a

10   longer time period, at least the whole summer, so we asked them

11   to move out.

12   Q    Okay.  And do you still have that house?

13   A    No.

14   Q    Why not?

15   A    We sold that house.

16   Q    When did you sell it?

17   A    That house was sold in October of 2020.

18   Q    Okay.  And then what happened?

19   A    Well, after selling the house -- we sold the house to some

20   friends -- they leased it back to us.  We eventually had a

21   disagreement with our friends.  One of them had what I would call

22   an obsession with Respondent Chang, was entering our house

23   without permission repeatedly and speaking with the older son,

24   D.D.M.  We had to file charges against them.  Things became

25   incredibly uncomfortable there, and we left the home.

1    Q    Okay.  And after you left the home, where did you go?

2    A    Yeah.  So when we left, we had had a number of different

3    issues on the island, and it was not somewhere that we wanted to

4    live any further in the future.  We certainly would be happy to

5    come back and visit at times with family, maybe for a summer at

6    the most, but we were looking to do a permanent relocation off

7    the island and not to return.

8         So we had already sold the house.  We gave away or sold the

9    vast majority of our belongings/possessions from that home and

10   otherwise.  Then we packed up our car with everything we possibly

11   could, all of our valuable possessions, and we drove all the way

12   to Tijuana, Mexico.  We had everything we could possibly carry

13   with us as we were relocating permanently to our home in Mexico.

14   So we stopped there and packed four large boxes full of our

15   belongings, so that we could get on a flight, and took the last

16   leg from Tijuana to the airport servicing Buena Vista.

17   Q    And do you have any belongings left in Island County?

18   A    I mean, at this point, I do, because I'm -- it's not my will,

19   but I'm forced to be in Island County to spend time with my son.

20   So we do have a few belongings there now.

21   Q    All right.  So please look at Exhibit No. 24.  Do you

22   recognize this exhibit?

23   A    I do.

24   Q    What is it?

25   A    This is Respondent Chang when we arrived in Tijuana, as I was

1   just mentioning.  So our car was very full for our permanent

2   relocation to our home in Buena Vista.  We couldn't take all of

3   our belongings on the flight, so we stopped at the post office

4   and filled four very large boxes with all of those belongings and

5   shipped them to our home.

6   Q    Do you know who took this picture?

7   A    Yes, I did.

8   Q    How did you take it?

9   A    I took it on my phone.

10  Q    When did you take it?

11  A    December 6th, 2022 -- or December 6th, 2021.

12  Q    All right.  Is this a true and accurate copy of the picture

13  you took?

14  A    Yes.

15        MR. BENNETT:  I move to admit Exhibit No. 24, Your

16  Honor.

17        THE COURT:  Any objection?

18        MS. CHANG MORRISON:  No.

19        THE COURT:  24 is admitted.

20              (Exhibit No. 24 admitted.)

21  Q    All right.  So was it both parties' intent to permanently

22  relocate to Mexico?

23  A    Yes.

24  Q    Well, permanently live in Mexico at this time?

25  A    Yes.

1    Q    All right.  And how much of your personal property did you

2    sell when you vacated the house in Island County?

3    A    Just about everything.  I mean, we kept camping gear and

4    snowboards, things that we would only use there when we came to

5    visit.  But we -- I gave my bed to my father.  All of our tables,

6    chairs, places for storing things, we gave and sold all of that

7    away.

8    Q    All right.  And then the house in Buena Vista, is that where

9    most of your personal property is now?

10   A    Yes.

11   Q    Can you please describe -- is the house furnished?

12   A    Yeah, it's completely furnished.  It's quite large and nice.

13   It's got three furnished kitchens, it's got five large bedrooms,

14   probably eight or nine or ten beds, dining tables, extensive

15   supplies for the beach.  You know, everything you could expect to

16   find in a fully furnished home.

17   Q    Okay.  And so you arrived back in Buena Vista when?

18   A    So we arrove {sic} to Buena Vista the day after that picture

19   was taken, on December 7th, 2021.

20   Q    All right.  And then how long did you stay there?

21   A    We stayed there for six months, until May 25th, 2022.

22   Q    All right.  And what happened on May 25th, 2022?

23   A    Well, we had made plans to go look for a second home, a

24   summer home in the U.S., in Colorado or Utah, I'm sorry, or as a

25   backup plan, maybe Oklahoma, but that day, Respondent Chang

1    refused to go to the airport.  She said that she wanted to remain

2    permanently at our home in Mexico and she never wanted to go back

3    to the United States, and after several very tense and

4    uncomfortable hours, she finally changed her mind, and at the

5    very last minute, we made a mad dash of collecting our belongings

6    and packing and making our way to the airport.

7    Q    Okay.  And where did you fly to?

8    A    We flew to Tijuana.

9    Q    What did you do then?

10   A    Then we picked up our car and we drove through the Southwest

11   to Meeker, Colorado.

12   Q    All right.  And did you look at houses in Meeker?

13   A    We did, yes.

14   Q    Why summer houses?

15   A    Well, the main problem for me, personally, Fany was --

16   Respondent Chang was very happy living at our home in Buena Vista

17   permanently.  She actually enjoyed the summers there.  She likes

18   the sun.  But for me, personally, it's tough for me to be at

19   that location during the summers.

20       The previous month, I was overseeing the construction and

21   remodeling of our home during the very hot summer months, and it

22   was rather unpleasant for me.  So I was looking for somewhere to

23   get away, at least for the summers, where I could be more

24   comfortable.

25   Q    Okay.  And did you look in Washington State for a summer

1    house?

2    A    No.

3    Q    Why not?

4    A    We didn't have any intentions of coming back to Washington.

5    As I mentioned, we'd had very uncomfortable, tense relations with

6    who had been our best friends and we had a number of other issues

7    there.

8        In addition, during that time period, it was just after

9    COVID, and there was a tremendous increase in the price of homes,

10   and the savings we had left after remodeling our home in Buena

11   Vista wouldn't be sufficient to build or purchase a home in

12   Washington.

13   Q    How much money did you spend to remodel your home in Buena

14   Vista?

15   A    I don't have an exact count, but I would estimate maybe 250-

16   to $300,000.

17   Q    All right.  And can you describe the condition of the Buena

18   Vista home currently?

19   A    It's in excellent condition.  I think it's probably one of

20   the most amazing homes I have ever seen.  Yeah, it's beautiful.

21   Q    And you didn't find a summer home in the U.S., correct?

22   A    No, we didn't.

23   Q    What happened then?

24   A    Yeah, so we didn't find anything that would meet our needs in

25   Colorado.  I don't even remember why we thought we would find

1  something in Oklahoma, but for some reason, that was on our list.

2  And we tried Oklahoma, and that was not successful either.

3      I suggested returning home -- Respondent Chang has admitted

4  this in her responses, that I requested to go home at that point

5  in time -- but she was emphatic about wanting to go visit Whidbey

6  Island and our family and friends there.  I did not want to go

7  there.  I told her -- I just didn't want to go back for a number

8  of reasons.  I told her I'd probably not be enjoying myself very

9  much after maybe a weekend there, but she wanted to go very

10  badly, and eventually we agreed to coming for two weeks, and

11  after two weeks, we would be returning home to Buena Vista.

12  Q   So did you drive to Whidbey Island?

13  A   We did, yes.

14  Q   Is Whidbey Island in Island County?

15  A   Yes.

16  Q   Okay.  And did you stay somewhere while you were there?

17  A   Yeah.  We were staying at my mother's home.

18  Q   Okay.  All right.  And did the visit last two weeks?

19  A   No.

20  Q   Why not?

21  A   Well, after two weeks, Respondent Chang requested to stay

22  later.  To be honest, I wasn't all that anxious to get back to

23  the summer heat in Buena Vista, so I did reluctantly agree to

24  stay an additional several weeks.  But then, by mid-July, I told

25  her that I had had enough, I was uncomfortable here for a number

1    of circumstances, and I was past ready to go home and I would

2    like to return home to Buena Vista.

3    Q    All right.  Please turn to Exhibit No. 20.  Do you recognize

4    Exhibit No. 20?

5    A    Yes.

6    Q    What is it?

7    A    This is a text message from our -- or a text string from my

8    sister Amber to Respondent Chang.

9    Q    And which text messages are your sister Amber's and which

10   text messages are Ms. Chang's?

11   A    Ms. Chang's messages have the arrow.

12   Q    Are they on the right side?

13   A    On the right-hand side, yes.

14   Q    And can you describe this conversation?

15   A    Yes.  So my sister Amber asked Respondent Chang, "Do you have

16   any idea when you might leave, one day, one week?"  And this

17   question was being posed on June 17th, 2022.  So I think this was

18   a very good opportunity for Respondent Chang to let it be known

19   if she intended to stay permanently or temporarily, and she did

20   not say that she intended to stay permanently or for a year or

21   for months.  She let my sister know, "I think we will stay here

22   for some weeks."

23   Q    All right.  Did you obtain this document?

24   A    I obtained this document through the exhibits that Respondent

25   Chang filed to this -- to my petition in this proceeding.

1   Q   So this was in one of her exhibits, in her response to the

2   petition?

3   A   Correct.

4   Q   Is this a true and accurate copy of that text message string?

5   A   Yes.

6        MR. BENNETT:  Your Honor, I would move to admit Exhibit

7   No. 20.

8        THE COURT:  Any objection?

9        MS. CHANG MORRISON:  No.  No, Your Honor.

10       THE COURT:  20 is admitted.

11             (Exhibit No. 20 admitted.)

12  Q   So, at the time, it was both parties' intent just to stay for

13  a couple weeks in Island County?

14  A   Correct.

15  Q   All right.  Was your son enrolled in day care in Island

16  County for that period of time?

17  A   Not initially.  That wasn't our original intent, was to

18  enroll him in day care, but, eventually, we did enroll him for

19  some time in day care.

20  Q   And why did you do that?

21  A   It's just a lot to have two kids at home all the time.  So we

22  thought it would be good for him and for us for him to be in day

23  care temporarily.

24  Q   All right.  Please turn to Exhibit No. 19.  Do you recognize

25  Exhibit No. 19?

1    A    Yes.

2    Q    What is it?

3    A    This is an e-mail correspondence between Respondent Chang and

4    the director of the Children's Center.

5    Q    Okay.  What is the Children's Center?

6    A    It's like a preschool facility.  Maybe not preschool, day

7    care facility for children from, I believe, age one up until they

8    go to kindergarten, maybe age four or five.

9    Q    And where is that located?

10   A    Langley, Washington.

11   Q    All right.  And where on Whidbey Island were you staying?

12   A    At this point in time, when this e-mail was sent, we were

13   staying at my mother's house in Langley, just a few blocks from

14   this location.

15   Q    All right.  And what's the relevance of this e-mail?

16   A    Again, Respondent Chang has argued repeatedly that her

17   intent, and even our intent, coming to Whidbey Island, was to

18   stay permanently.  In particular, she's argued repeatedly in her

19   response that we both intended and actually enrolled our son for

20   the whole year at this day care facility.  And that's just not

21   the case.  It's not true.  And this shows that that's not the

22   case.

23        We can see that this e-mail string that Respondent Chang

24   started was labeled "Summer," and her intent here was to enroll

25   our son for a limited period of time, possibly the whole summer,

1   possibly part of the summer.  But we can see it was clearly not

2   her intent and nor did she enroll our son in day care for an

3   entire year.

4   Q    All right.  Please turn to Page No. 2 of Exhibit No. 19.  And

5   is this an address from Ms. Chang to the day care?

6   A    Yes.  This was an e-mail from Ms. Chang to Caitlin, the

7   director of the day care.

8   Q    Now, she's telling the day care, basically, you are just back

9   for the summer?

10  A    Exactly, yeah.  Her words here are, "We are back to the

11  island for the summer."

12  Q    And Exhibit No. 19, is this a true and accurate copy of the

13  e-mail string?

14  A    Yes.

15          MR. BENNETT:  Move to admit Exhibit No. 19, Your Honor.

16          THE COURT:  Any objection?

17          MS. CHANG MORRISON:  No, Your Honor.

18          THE COURT:  19 is admitted.

19                  (Exhibit No. 19 admitted.)

20  Q    All right.  So the summer of 2022 is over and you're still in

21  Island County, correct?

22  A    In the beginning of December 2022, I myself was in Mexico at

23  our home.

24  Q    Okay.  But at the end of summer 2022, you were still in

25  Island County, correct?

1    A    At the end of the summer, yes.

2    Q    Why is that?

3    A    Well, yeah, Respondent Chang had asked to stay on additional

4    two weeks, which I had agreed to, reluctantly, as I mentioned,

5    but then she refused to go home in July, as we had agreed.  And

6    at that point, we had come to an agreement that we would do a

7    divorce in Mexico, we would do that later in the summer when she

8    was ready to leave.  But then at the end of the summer, she

9    refused again to go back home to Buena Vista, and she wanted to

10   negotiate a new agreement that I eventually agreed to.  And the

11   new agreement in August was that she and her son, her older son,

12   D.D.M., would stay on the island for the school year, and just as

13   soon as I was ready and wanted to go, in coming months, back

14   home, that we could do so, with our son R.E.M.

15   Q    Okay.  And where were you staying at the time that this was

16   happening?

17   A    Yeah.  We were, unfortunately, still staying at my mother's

18   home.

19   Q    And so the whole family is basically staying in the same

20   place?

21   A    Sort of.  You know, very quickly after we had arrived there,

22   we had had issues, and I moved into the mother-in-law unit above

23   the garage.  So I was staying mostly in that location, and

24   Respondent Chang was staying inside the house.

25   Q    All right.  And then you testified that you went back to

1    Mexico at some point?

2    A    Yes.

3    Q    All right.  When did you do that?

4    A    Yeah.  So per our agreements, as soon as I was ready, I was

5    supposed to go home with my son to our home in Buena Vista.  I

6    held out as long as I possibly could.  At times, there were

7    reconciliation.  I have always been very dedicated to the notion

8    of marriage, and I was hoping to be able to reconcile and keep

9    our family together.  I could see, eventually, that wasn't going

10   to happen, and I was very ready to leave to go home.

11       I bought tickets for my son and I, with a departure date a

12   few days out.  I let Respondent Chang know that I had bought

13   tickets, that we would be leaving soon.  And I was very shocked

14   and very devastated to understand that she was not willing to

15   honor her agreement.  She refused to let me go home with my son.

16   You know, on kind of an ongoing basis, she refused to let us go

17   home just for a month, she refused to let us go home for a --

18   weeks, and she wouldn't even let us go home for a few days.

19   Q    Please turn to Exhibit No. 5.  Do you recognize Exhibit

20   No. 5?

21   A    Yes.

22   Q    What is it?

23   A    These are the tickets that I purchased for my son R.E.M. and

24   I to go home.

25   Q    And when did you purchase those tickets?

 1   A    I believe it was around November 4th, 2022.

 2   Q    Okay.  So it was your intent to return to Mexico with your

 3   son in November of 2022?

 4   A    Yes.

 5   Q    And did that happen?

 6   A    No.

 7   Q    And why not?

 8   A    Well, I imagine I would have been within my rights to take my

 9   son home, but Respondent Chang has beat me several times, she's

10   very possessive of her children, and I was concerned that if I

11   would have attempted to take my son home with me, there would

12   have been a physical altercation where I could have been injured

13   and there could have been physical and emotional harm to my

14   child.

15   Q    At this time, was there any litigation, divorce litigation,

16   pending anywhere?

17   A    No.

18   Q    All right.  And at this time, were you -- you had custody

19   rights of R.E.M.?

20   A    Yes.

21   Q    How do you know that?

22   A    Well, I know there's the standard custody rights in both the

23   U.S. and Mexico, that I would have rights to both of those.

24   Q    And were you exercising those rights?

25   A    Yes.

```
 1   Q   How were you doing that?

 2   A   Well, I had regular interaction with my son every day, as a

 3   normal father would.

 4   Q   Okay.  So, yeah, you were parenting him?

 5   A   Yes.

 6   Q   Were you making decisions with Ms. Chang about your son?

 7   A   Yes.

 8   Q   All right.  Turning back to Exhibit No. 5, did you make this

 9   document?

10   A   Yes.

11   Q   How did you make it?

12   A   This is probably -- this is a screenshot from my phone.

13   Q   All right.  And is Exhibit No. 5 a true and accurate copy of

14   the screenshot?

15   A   Yes.

16   Q   And are these the tickets you attempted to purchase to return

17   to Mexico with your son in November?

18   A   Yes.

19          MR. BENNETT:  All right.  Your Honor, I would move to

20   admit Exhibit No. 5.

21          THE COURT:  Any objection?

22          MS. CHANG MORRISON:  No, Your Honor.

23          THE COURT:  Five is admitted.

24                  (Exhibit No. 5 admitted.)

25   Q   All right.  And did you return to Mexico in November 2022 by
```

1    yourself?

2    A    Yes.

3    Q    Why did you do that?

4    A    For a couple reasons.  One was it was very clear to me, after

5    Respondent Chang had refused to honor our agreements and let me

6    take my son home, that we would need to divorce, and we had long

7    agreed to do the divorce in Mexico, so I was traveling to file

8    for that divorce.

9         Also, there was a somewhat urgent need to return home to

10   assist Respondent Chang's parents.  They had been building their

11   own home just down the street from our home in Buena Vista.

12   Their home is just a five-minute drive away in Los Barriles.

13        Do you want me to spell that?  B-a-r-r-i -- B-a- -- of course

14   I'm going to miss it.  It's two r's and one l, B-a-r-r-i-l-e-s.

15        So, unfortunately, they did not have a lot of experience with

16   construction, and they were trying to supervise, you know, design

17   and supervise the construction of their own home in Los Barriles,

18   and it was going very poorly.  So they had spent their entire

19   life savings on the home.  It was not completed, it was not

20   structurally sound, it was deteriorating, and if I hadn't come

21   down to help them, they would have essentially lost their entire

22   life savings that was rotting away in their failed-construction

23   effort.  So I went down to help them save that home.

24   Q    And why were the maternal grandparents building a new home

25   about five miles away from yours?

 1  A    Yeah.  So they're originally from Chiapas, but that was sort

 2  of their dream retirement location.  And certainly when we

 3  decided to buy a home there, they were, you know, very joyful at

 4  the prospect of being able to live in the same place where they

 5  wanted to live and have, you know, their family and grandchild

 6  just down the street.

 7  Q    All right.  And does R.E.M. have a relationship with his

 8  maternal grandparents?

 9  A    Yes.

10  Q    Describe that relationship.

11  A    I would consider it a typical relationship between a child

12  and their grandparents.  They enjoy spending time together,

13  eating meals together, you know, going to the beach, and that

14  sort of thing.

15  Q    All right.  Please turn to Exhibit No. 6.  And do you

16  recognize Exhibit No. 6?

17  A    Yes.

18  Q    What is it?

19  A    This is the original divorce that I filed in Cabo San Lucas,

20  Mexico.

21  Q    All right.  And so does this document show you filed the

22  case?

23  A    Yes.

24  Q    And is this a true and accurate copy of the receipt?

25  A    Yes.

1       MR. BENNETT:  Your Honor, I would move to admit Exhibit

2  No. 6.

3       THE COURT:  Any objection?

4       MS. CHANG MORRISON:  No, Your Honor.

5       THE COURT:  Exhibit 6 is admitted.

6                (Exhibit No. 6 admitted.)

7  Q   All right.  What's the current status of this case?

8  A   Well, this case was -- it was convenient for my attorney to

9  file at this location in Cabo San Lucas, because that's where

10  their office was, but it wasn't very convenient for me.

11  Originally, we thought this was going to be a simple, amicable

12  divorce, nobody would need to be present, but, later, we found

13  out that was not going to be the case and there was going to be,

14  mostly likely, a contested divorce with a number of hearings and

15  requirements to be in person.  So, later, what I understood to be

16  a change of venue, to move the divorce from Cabo San Lucas to San

17  Jose, which was much closer to my home, and so, eventually, I

18  desisted from these proceedings, in favor of the San Jose

19  proceedings.

20  Q   And did you file proceedings in San Jose?

21  A   Yes.

22  Q   When did you do that?

23  A   January 24th, 2023.

24  Q   All right.  And has Ms. Chang received notice of those

25  proceedings?

 1   A    Yes, we took a copy of the full proceedings, and they were

 2   served to Respondent Chang on March 6th, 2023, on the island by

 3   an Island County sheriff.

 4   Q    Okay.  All right.  And then after your, I guess, trip to

 5   Mexico, did you return to Island County?

 6   A    Yes.

 7   Q    When did you do that?

 8   A    I believe it was December 13th, 2022.

 9   Q    All right.  And where did you return to exactly?

10   A    I returned back to where I expected to find my wife and

11   children, at my mother's home.

12   Q    And were your wife and children at your mother's home?

13   A    No, they were not.

14   Q    Why not?

15   A    Apparently, Respondent Chang had decided, in secret, to move

16   out of my mother's home and to rent a place for just her and the

17   children in Freeland.

18   Q    Okay.  Did Ms. Chang notify you that she intended to move?

19   A    No.

20   Q    And it was a surprise to you when you got back to discover

21   she had moved?

22   A    Yes, it was very disconcerting.

23   Q    Did you react to the move?

24   A    I'm not sure what you mean.  I certainly wasn't happy and I

25   was very confused about what was going on.

1  Q   Okay.  And then did you communicate with Ms. Chang after she

2  moved?

3  A   Yeah, I talked to her that night.  I said, "I would like to

4  know where you are and I would like to see my children."  She

5  said I would have to wait until the next day to see them, and she

6  wouldn't tell me where they were.

7  Q   Did you eventually get to see your children?

8  A   I did.

9  Q   And you're referring to D.D.M. as your child?

10  A   Yes.

11  Q   Why?

12  A   Well, he refers to me as his father and I'm his stepfather.

13  Q   All right.  And then did you eventually work out an agreement

14  whereby you could return to Mexico with your son R.E.M.?

15  A   Yes.

16  Q   When did that happen?

17  A   Just days after the return in December, Respondent Chang made

18  a new agreement.  I guess this may have been the fourth or fifth

19  one.  She now was giving me permission to spend one month every

20  winter, one month every summer, with my son in Mexico, and if I

21  was around on the island, I could pick him up from school every

22  day and have him, I think, every weekend.

23  Q   And did you do that?

24  A   Did I do what?

25  Q   Have him every day, pick him up every weekend?  In other

1   words, did you have regular visitation with R.E.M.?

2   A   Well, I did have regular visitation, but she never keeps a

3   schedule.  And, basically, everything that she agrees to or

4   suggests evolves; it's constantly changing.

5   Q   Do you recall the location of the house that Ms. Chang

6   rented?

7   A   Yes.

8   Q   What is it?

9   A   I believe the address is 6045 McMaster in Freeland.

10  Q   Okay.  And were you staying with your mother at that time?

11  A   Well, when I first returned to the island, I was staying

12  initially with my mother because that's where I expected to find

13  my family.  I did stay there for a number of days.  As I got my

14  bearings to the new reality that my wife and children had moved

15  out and moved somewhere else, I began to understand what was

16  happening.  But as soon as possible, certainly before Christmas,

17  I began staying with Respondent Chang periodically and with my

18  sister on the island and with my father on the island.

19  Q   Which sister is that?

20  A   Misty.

21  Q   I'm sorry?

22  A   Misty.

23  Q   Okay.  Where does Misty live?

24  A   She lives in Freeland.  And it was actually just a few

25  minutes down the road from where the Respondent Chang was staying

1    with my children -- our children.

2    Q    Where does your father live?

3    A    He lives also on the south end of the island.  It's

4    technically in Clinton.  I'd probably call it Bayview.

5    Q    Okay.  And are all these places pretty close together?

6    A    Yes.

7    Q    Did Ms. Chang initiate a divorce action in Island County?

8    A    Yes.

9    Q    How do you know that?

10   A    I came to know of the divorce proceedings on January 24th,

11   2023, when she e-mailed a few orders that had been filed to my

12   Mexican attorney.

13   Q    Okay.  And did Ms. Chang attempt to serve you with those

14   orders?

15   A    With those orders?  I mean, she -- I think she was -- well,

16   she e-mailed those to my attorney.

17   Q    Okay.  And did you return to Buena Vista, Mexico, with your

18   son R.E.M.?

19   A    Yes.

20   Q    When did you do that?

21   A    We returned -- we arrived on January 4th, 2023.

22   Q    Okay.  And when did you leave Island County?

23   A    We left Island County on January 3rd, 2023.

24   Q    And when you left Island County, were you aware that a

25   divorce proceeding had been initiated in Island County?

1   A    No.  Respondent Chang had gone out of her way to keep that a

2   secret.

3   Q    All right.  And then how did you get your son R.E.M. to the

4   airport from Island County?

5   A    We drove.

6   Q    Was there any -- how did you get custody of him?

7   A    Oh.  Yeah, I just picked him up at day care, checked him out,

8   and we drove to the airport.

9   Q    All right.  Were you authorized to pick him up at day care?

10  A    Yes.

11  Q    Did you believe you had Ms. Chang's agreement to take him to

12  Mexico with you?

13  A    Yes.  We had talked about this repeatedly in the previous

14  weeks, and I had specifically sent her a text message on

15  December 23rd -- December 29th, letting her know that we were

16  ready to go; school was going to be starting for him on

17  January 9th; we needed to arrive some days in advance of

18  January 9th to get him prepared for school; and that there were

19  good flights that I was seeing every day at reasonable prices,

20  and I was just waiting on a good flight to go ahead and purchase

21  that and make the trip home.

22  Q    And did anybody try to stop you from taking R.E.M. down to

23  Mexico with you?

24  A    No.

25  Q    And so you have testified earlier that you arrived in Mexico,

1    Buena Vista, on January 4th?

2    A    Yes.

3    Q    All right.  What did you do next?

4    A    The first thing I did when we got through Customs is I called

5    Respondent Chang to let her know we had arrived safely and asked

6    her if she wanted to speak to our son.

7    Q    Okay.  And then you mentioned the school starting on the 9th?

8    A    Yes.

9    Q    Did you enroll R.E.M. in school?

10   A    I did, yes.

11   Q    In Mexico, did you have the authority to do that?

12   A    Yes.

13   Q    Describe that process of enrolling R.E.M. in school.

14   A    Yes.  So I arrived at the director's office with the basic

15   paperwork, like his ID card in Mexico, which is called a CURP,

16   C-U-R-P, his birth certificate, my ID, probably Respondent

17   Chang's ID, things of that nature.  Basic information.

18   Q    Okay.  And then when was the enrollment process complete?

19   A    Well, I believe the school started on Monday the 9th, and so

20   he was registered certainly on the previous Friday, maybe

21   Thursday, before enrollment.  And I took him to school so he

22   could meet his teacher and the staff and get to know the

23   facilities and the playgrounds, so he would be comfortable with

24   the school, and I showed him how to use the bathroom, if he had

25   to go to the bathroom while he was at school.  And I just got him

1   ready for school as best I could.

2       And Respondent Chang's parents were actually quite helpful

3   initially at that point in time.  We were all living together,

4   eating meals together, and they helped me sew his new school

5   uniform so it was the right length for him.

6   Q   All right.  So you were living together with R.E.M. and the

7   maternal grandparents in the same house?

8   A   Yes.  I was on the middle floor, and they were on the bottom

9   floor.

10  Q   All right.  Please look at Exhibit No. 30.  Exhibit No. 30

11  comprises of four pages of photos, correct?

12  A   Yes.

13  Q   All right.  And back to page 1 of Exhibit No. 30, did you

14  take this photo?

15  A   Yes.

16  Q   How did you take it?

17  A   On my phone.

18  Q   When did you take it?

19  A   August 18th, 2021.

20  Q   And what did you take the photo of?

21  A   This is our home in Buena Vista.

22  Q   Okay.  And is this the current condition of the home?

23  A   It's not far off.  We hadn't installed the windows down below

24  and we put some wood adjustable windows in some of these slots

25  here.  But it's pretty close.  We also put a large sliding glass

1   door down below.  And all of this area down here has been

2   finished as well, with bricks and things like that, and this area

3   where the parking is has been paved.

4   Q    All right.  And is the home on three levels?

5   A    Yes.

6   Q    What are the three levels?

7   A    Downstairs, there's a kitchen, it's sort of a one-bedroom

8   with two bathrooms, and a nice patio.

9        The middle floor has got -- it's like the primary kitchen,

10  two large bedrooms, three bathrooms.

11       And on the upstairs level, there's a really nice open-air

12  kitchen with a palapa roof, and there's two large bedrooms, and a

13  total of three bathrooms.

14  Q    All right.  Please turn to page 2 of Exhibit No. 30.  And did

15  you take this picture?

16  A    Yes.

17  Q    How did you take it?

18  A    On my phone.

19  Q    When did you take it?

20  A    On January 15th, 2022.

21  Q    And what does the picture depict?

22  A    This is the main bedroom in the upstairs part of the house,

23  and it shows the view.

24  Q    Okay.  Is that like a master bedroom?

25  A    Yes, you could consider this the master bedroom for the top

 1   floor.

 2   Q   And please turn to page 3 of Exhibit No. 30.  Did you take

 3   this photo?

 4   A   Yes.

 5   Q   When did you take it?

 6   A   New Year's Day, January 1st, 2022.

 7   Q   How did you take it?

 8   A   I think you could call this a selfie.

 9   Q   All right.  A selfie with your phone?

10   A   Yes.

11   Q   All right.  And what does this photo depict?

12   A   Well, we had kind of a special time for New Year's that year.

13   A large portion of Respondent Chang's family had traveled from

14   other locations in Mexico to spend New Year's with us at our

15   home.  And so we can see, for example, Tio Hector, Respondent

16   Chang's parents, her cousins, our two sons, D.D.M. and R.E.M., my

17   mother.  You know, a lot of family having a really great time at

18   our home on New Year's.

19   Q   So do you have an extensive group of family and friends in

20   Mexico?

21   A   Yes.

22   Q   All right.  And does R.E.M. fit in with these people?

23   A   Oh, certainly.

24   Q   All right.  And then please turn to page 4 of Exhibit No. 30.

25   And what does this photo depict?

1    A    This was a party at our house, again, on the top floor.

2    Q    So that is the top floor with the palapas and --

3    A    Yes.

4    Q    And did you take this photo?

5    A    Yes.

6    Q    What did you take it with?

7    A    My phone.

8    Q    And when did you take it?

9    A    May 20th, 2022.  So this would have been five days before we

10   left our home.

11   Q    And are all of these photos true and accurate copies of the

12   photos you took with your phone?

13   A    Yes.

14        MR. BENNETT:  Your Honor, I would move to admit Exhibit

15   No. 30.

16        THE COURT:  Any objection?

17        MS. CHANG MORRISON:  No, Your Honor.

18        THE COURT:  30 is admitted.

19             (Exhibit No. 30 admitted.)

20   Q    Okay.  So you testified earlier that you enrolled R.E.M. in

21   school in January of 2023, correct?

22   A    Yes.

23   Q    Did you do anything else to get him active in the local

24   community?

25   A    Yes.  And he certainly feels right at home.  That's the home

1    where he's lived more than, I think, any other place in his life.

2    He just loves it there, and he's immediately accepted by the

3    entire community.  I think kind of as one of the few

4    dual-language and dual-citizenship people there, he kind of has a

5    special place in the heart of a lot of people in our community.

6    Q    Did you enroll him in any activities in Buena Vista?

7    A    Yeah.  He was on a soccer team.  We had pick-up soccer.  He

8    would go to pickle ball trainings.  He was also in folkloric

9    dance for a little while, and he was also in a yoga class.  It

10   was great.

11   Q    All right.  And how is R.E.M. doing in school?

12   A    Great.  I was surprised, actually, when I went to check with

13   the teacher.  Because he's bilingual, I didn't know if his level

14   of Spanish was going to be sufficient to be going to an actual,

15   you know, first -- what they call "first grade" in the national

16   education system, excuse me, but I was just so delighted to hear

17   from the teacher that he was actually above grade level in his

18   Spanish and was doing great at school.

19              THE WITNESS:  Could I have some water?

20              THE CLERK:  There's some next to you.

21              THE COURT:  Counsel, why don't we take a short recess of

22   ten minutes?  We will resume again.  And I will try and go as

23   close to four o'clock as I can, but I have another scheduled

24   matter I have to take care of.

25       So we will recess at this time for ten minutes, and we will

1    begin a couple of minutes before 3:00.

2              MR. BENNETT:  Yes, Your Honor.

3              THE CLERK:  Please rise.

4                        (Recessed.)

5              THE COURT:  Good afternoon again.  Please be seated.

6        Counsel, you may resume your direct examination.

7              MR. BENNETT:  Thank you, Your Honor.

8    Q    Mr. Morrison, you testified earlier that your son is

9    bilingual, correct?

10   A    That's correct.

11   Q    Those languages are Spanish and English?

12   A    Yes.

13   Q    Are one of those primary with him; in other words, does he

14   speak one better than the other?

15   A    I think he's equally proficient in both languages.

16   Q    Okay.  And what language do you speak with him when you're

17   home together with him?

18   A    When we're alone together at home, we always speak Spanish,

19   and it's been that way basically since his birth.

20   Q    And do you know what language his mother speaks with him?

21   A    I believe she speaks Spanish with him as well.

22   Q    And describe your proficiency with Spanish.

23   A    I would consider myself completely fluent at this point.

24   Q    All right.  And how did your son R.E.M. react to living in

25   Buena Vista with you?

1    A    You know, he loved it.  Yeah, he immediately fits right into

2    the community, with friends and family.  And I have never seen

3    him as happy as I've seen him before, as how he was when we were

4    living together in Buena Vista.

5    Q    All right.  And your housing situation in Buena Vista, is it

6    stable?

7    A    Yes.

8    Q    And is your employment situation in Buena Vista stable?

9    A    Yes.

10   Q    Why do you say that?

11   A    I own my own company, I have for 12 years now, and we have a

12   stable income stream.

13   Q    Okay.  And your son also lived in Buena Vista for several

14   months before you went on the house-hunting trip, correct?

15   A    Yes.

16   Q    All right.  And describe how he, I don't know, liked living

17   there before then.

18   A    When we were all living there as a family, again, he also

19   loved it.  If it was with me and the friends and family that were

20   visiting, he enjoyed that, and he certainly enjoyed it as well

21   when his mother was living there as well.

22   Q    Was he attending school at that time?

23   A    No.  When we were all there as a complete family, he wasn't

24   old enough to be in school yet, so we set up sort of an informal

25   day care with a number of other families.

1   Q    Okay.  And how often was he in day care?

2   A    We would do the group with other kids maybe like two or three

3   times per week.  And he had a nanny who would -- he would spend

4   time with his nanny maybe -- you know, maybe twice a week with

5   the other kids and maybe twice a week with the nanny, just the

6   nanny.

7   Q    All right.  And at that time, were you also working in

8   Mexico?

9   A    Yes.  When we were all there as a family, I was finishing the

10  remodeling and expansions of the home.

11  Q    Okay.  And do you currently work?

12  A    Yes.

13  Q    Please describe what you do.

14  A    Sure.

15       Yes, I'm the founder and CEO of a company called "True

16  Mileage," and our company does technology and analytics in the

17  usage-based auto insurance space.

18  Q    Okay.  And do you have to work at a certain location, or can

19  you work remotely?

20  A    No.  I can work remotely.

21  Q    From anywhere?

22  A    Yes.

23  Q    Okay.  Please turn to Exhibit No. 14.

24       Do you recognize Exhibit No. 14?

25  A    Yes.

1    Q    What is it?

2    A    This is the divorce proceedings filings in San Jose, BCS.

3    Q    And is this a true and accurate copy of the divorce

4    proceedings?

5    A    Yes.

6    Q    Okay.

7                MR. BENNETT:  I move to admit to Exhibit No. 14.

8                THE COURT:  Any objection?

9                MS. CHANG MORRISON:  No.

10               THE COURT:  Exhibit 14 is admitted.

11                    (Exhibit No. 14 admitted.)

12   Q    And what's the current status of this case?

13   A    Respondent Chang filed a -- contested the status of this

14   divorce.  So it was passed from San Jose to La Paz for a

15   challenge of jurisdiction.  She had a preliminary ruling in her

16   favor suspending the case and jurisdiction, but they have not

17   passed the final judgment.  I filed an appeal, which I do expect

18   to win and for the case to proceed.

19   Q    And why do you expect to win your appeal?

20   A    I think there's a bit of confusion as to what the last

21   conjugal address is.  That's one of the key criteria for a

22   divorce in Mexico.  They're of the -- well, they have the

23   certainty that the last certain conjugal address that they have

24   is our home in Buena Vista.  They say that the address at my

25   mother's home in Langley cannot be considered as a conjugal

1  address simply because it's my mother's home.  They're of the

2  impression that the courts in Washington must have found or known

3  about another conjugal address that doesn't exist.  So when that

4  discrepancy is clarified, I expect jurisdiction to be accepted

5  and for the case to proceed in San Jose.

6  Q   All right.  Please turn to Exhibit No. 23.  Do you recognize

7  Exhibit 23?

8  A   Yes.

9  Q   What is it?

10 A   These are the -- I believe it's called "patria potestad" in

11 Spanish.

12         THE COURT REPORTER:  Can you spell that, please?

13         THE WITNESS:  P-a-t-r-i-a p-o-t-e-s-t-a-d.

14 A   And this is the document that gives parents their parental

15 rights in Mexico.  And it's very similar, I would imagine, in

16 most respects, to what we have here in the United States.

17 Q   Is this basically a statute that states what your parental

18 rights are in Mexico?

19 A   Yes.

20 Q   All right.  And did you make this document?

21 A   Well, I got this from my attorney in Mexico, and I had it

22 translated on Google Translate, and I believe I went through and

23 just made the -- you know, corrected a few typos.

24 Q   So your testimony is that your lawyer sent it to you and then

25 you translated it?

 1   A    Yes.

 2   Q    All right.  And is this a true and accurate copy of that

 3   document --

 4   A    Yes.

 5   Q    -- you created?

 6   A    Yes.

 7        MR. BENNETT:  Your Honor, I move to admit Exhibit

 8   No. 23.

 9        THE COURT:  Any objection?

10        MS. CHANG MORRISON:  I can't say that this is a true

11   copy of what they are saying.  I have no objection if you want to

12   admit it, but I don't know.

13        THE COURT:  All right.

14        MS. CHANG MORRISON:  I have never seen this document

15   before.

16        THE COURT:  All right.  That objection is overruled.  23

17   is admitted.

18                    (Exhibit No. 23 admitted.)

19   Q    All right.  Let's go back to when you returned to Buena Vista

20   with your son in January 2023.  How long were you there with your

21   son in 2023?

22   A    For -- well, three months altogether, January, February, and

23   part of March.

24   Q    All right.  And then is R.E.M. there now?

25   A    No.

1   Q    How did that happen?

2   A    So on March 2nd, 2023, Respondent Chang came unannounced to

3   Mexico, deceived -- she came to my son's school, which is in

4   neighboring Los Barriles.  She told the teachers that she wanted

5   information about registering a new student.  They told her to

6   come back after noon.  She proceeded to sneak into the school.

7   She was asked to leave.  She didn't leave.  She took our son

8   R.E.M. by force.  An altercation ensued with the teacher, and I

9   believe parents and other staff members.  The teacher was

10  assaulted and injured.  My son R.E.M. was injured and

11  traumatized.  And Respondent Chang took our son by force into a

12  vehicle and drove off.

13  Q    All right.  And did Ms. Chang have help to take her son?

14  A    She was the person who took my son.

15  Q    Okay.  And how do you know all this?

16  A    I was called minutes after the incidents by R.E.M.'s teacher.

17  I came to the school.  I was told by firsthand witnesses what

18  happened.  I videotaped recordings from a number of witnesses on

19  what happened.  I have a number of text message exchanges from

20  eyewitnesses on what happened.  And, later, I reviewed all the

21  sworn statements by all the witnesses in the criminal proceedings

22  against Respondent Chang.

23  Q    All right.  And did you turn to the authorities for help

24  after Ms. Chang took your son?

25  A    I did.  Later that day, I came to the prosecuting attorney's

 1   office in Los Barriles.  A criminal case for abduction and

 2   assault had already been started by R.E.M.'s teacher, and I added

 3   what statements I could and requested the return of my son R.E.M.

 4   Q   All right.  So you testified that a criminal case has been

 5   started?

 6   A   Yes.

 7   Q   Do you know the current status of that case?

 8   A   I do.

 9       Most recently, in January of 2024, I was requested to provide

10   additional evidence at my home in Buena Vista.  I was also

11   requested to make a presence in La Paz, where the case is being

12   prosecuted and investigated.  They took a full day's worth of

13   statements, videotaped statements, with a psychologist, trying to

14   quantify the damages to both myself and my son R.E.M.  The report

15   of the psychologist should be finalized this week, and the lead

16   investigator will continue with their investigation.

17   Q   All right.  Please turn to Exhibit No. 7.

18       All right.  Do you recognize Exhibit No. 7?

19   A   Yes.

20   Q   What is it?

21   A   Yeah.  So after I made my declaration, and the teacher did,

22   in Los Barriles on the criminal case, the following day -- it's

23   dated March 3rd, 2023 -- the district attorney in Los Barriles

24   sent this request to the deputy general attorney in La Paz.  And

25   La Paz is the capital of the state.  So this is the higher-up

1    office requesting an Amber Alert be placed on R.E.M. so that he

2    could be located and returned.

3    Q    All right.  You mentioned that La Paz is a capital of a state

4    in Mexico?

5    A    Yes.

6    Q    Which state?

7    A    In Spanish, we call it Baha California Sur.  In English, you

8    could translate it as Baha California South.  And it uses the

9    initials of BCS.

10   Q    Exhibit No. 7, does it contain the original in Spanish?

11   A    Yes.

12   Q    And then did you make a translation of the original?

13   A    And, actually, on this one, I'm not sure if I translated this

14   or if this was with an expert in San Jose.

15   Q    Okay.  And is this Exhibit No. 7 a true and accurate copy of

16   the Amber Alert document?

17   A    Yes.

18        MR. BENNETT:  Your Honor, I move to admit Exhibit No. 7.

19        THE COURT:  Any objection?

20        MS. CHANG MORRISON:  No, Your Honor.

21        THE COURT:  Seven is admitted.

22                    (Exhibit No. 7 admitted.)

23   Q    All right.  What was the purpose of the Amber Alert?

24   A    The purpose of the Amber Alert was to locate and return my

25   son to me, and, in particular, the Amber Alert also puts warnings

1   for border crossings and any flights, ferries, any way that

2   someone could -- you know, any fugitive with a kidnapped child

3   could be caught and retained.

4   Q   And did the authorities manage to apprehend R.E.M. or

5   Ms. Chang --

6   A   No.

7   Q   -- before they left Mexico?

8   A   No.

9   Q   Do you know how Ms. Chang and R.E.M. left Mexico?

10  A   No.

11  Q   All right.  Did you turn to anyone else for help with

12  securing the return of your son?

13  A   I also called Island County Police and I told them that my

14  son had been abducted, and if they happened to find my son or

15  Respondent Chang, that they could please take them into custody.

16  Q   All right.  And did you contact the U.S. Department of State?

17  A   I did, yeah.  I certainly didn't understand what all my

18  rights were and the opportunities for relief for some period of

19  time, but, eventually, I was searching and searching, and I

20  called a line for missing children, and they recommended I speak

21  with the Department of State.  And it was a tremendous relief.

22  For the first time, somebody understood what I was going through,

23  defined the technical terms -- "retention," "abduction," "further

24  retention"; in our case, the notion of "habitual residence" --

25  and the State Department was incredibly supportive and asked me

 1  to make an application for the return of my son.

 2  Q    Please turn to Exhibit No. 8.  Do you recognize Exhibit

 3  No. 8?

 4  A    Yes.

 5  Q    What is it?

 6  A    This is my application under the Hague Convention for the

 7  return of my son.

 8  Q    And when did you fill out this application?

 9  A    This is in July of 2023.

10  Q    And is this a true and accurate copy of that application?

11  A    Yes.

12  Q    All right.  What did the application result in?

13  A    They approved -- they approved the application, and they gave

14  me the opportunity to file here.

15  Q    Okay.

16            MR. BENNETT:  Your Honor, I forgot to move to admit

17  Exhibit No. 8.

18            THE COURT:  Any objection?

19            MS. CHANG MORRISON:  No, Your Honor.

20            THE COURT:  Eight is admitted.

21                    (Exhibit No. 8 admitted.)

22  Q    Okay.  And so you initiated this action, correct?

23  A    Yes.

24  Q    When did you do that?

25  A    So this application I filled out in July, and then the

1    petition was filed in October 2023.

2    Q    And was that less than a year from when your child was

3    initially retained in Island County?

4    A    Yes.

5    Q    And was it less than a year from when your child was removed

6    from Buena Vista?

7    A    Yes.

8    Q    All right.  And do you have any concerns flowing from

9    Ms. Chang's, let's just say, actions with regard to her oldest

10   son, D.D.M.?

11   A    Certainly.

12   Q    And why do you have those concerns?

13   A    Well, I think it's awful what she did to her older son.  She

14   took him away from his father when he was only a few months old,

15   falsified a birth certificate with the intention of keeping him

16   from his father.  And she's been very successful in using that

17   falsified document and other deceptions, to using a number of

18   people and, you know, institutions, to keep her son from his

19   father, who is a loving, caring father.  And there's no reason

20   why he should be separated from his son.  And I think she's done

21   tremendous emotional damage to her son that will last him a

22   lifetime.

23   Q    All right.  Please turn to Exhibit 10.  And do you recognize

24   Exhibit 10?

25   A    Yes.

1   Q   What is it?

2   A   This is Respondent Chang's older son, his original birth

3   certificate.

4   Q   And did you obtain this document?

5   A   Yes.

6   Q   How did you obtain it?

7   A   When I was at home with my son R.E.M. in Mexico, Respondent

8   Chang asked for a copy of all of her documents, and I found this

9   in the bottom of a folder.

10  Q   And you testified that it's the original birth certificate,

11  correct?

12  A   Yes.

13  Q   How do you know that?

14  A   Well, you can see from the date of birth that he was born in

15  September 2009, and there's a registration date on here that's

16  also in September of 2009, about a week after his birth.  So that

17  makes it look legitimate.

18  Q   All right.  And where was D.D.M. born?

19  A   He was born in -- you can see on this birth certificate that

20  he was born in Playa del Carmen.

21  Q   And what state is that in?

22  A   Quintana Roo.  I can spell that.

23          THE WITNESS:  You've have got it?  Okay.

24  Q   And is that in the same place where you met Ms. Chang?

25  A   Yes.

1  Q   And Exhibit No. 10, is that a true and accurate copy of the

2  birth certificate, original?

3  A   Yes.

4        MR. BENNETT:  I would move to admit Exhibit No. 10, Your

5  Honor.

6        THE COURT:  Any objection?

7        MS. CHANG MORRISON:  No, Your Honor.

8        THE COURT:  10 is admitted.

9              (Exhibit No. 10 admitted.)

10  Q   Please turn to Exhibit No. 11.  Do you recognize Exhibit

11  No. 11?

12  A   Yes.

13  Q   What is it?

14  A   So this is the second and falsified birth certificate for

15  Respondent Chang's older son.

16  Q   And how do you know it's falsified?

17  A   Well, you can see that this corresponds to the same child

18  because it has the same date of birth and the same name for the

19  mother, but there are three discrepancies or falsifications with

20  this document.  The first is that the name has been changed.  The

21  names used here are all family names from Respondent Chang and

22  her family; no names from the paternal -- from the father.  She's

23  also changed the location of the birth from -- on the original

24  birth certificate, it mentions the State of Quintana Roo, and

25  here it mentions Tuxtla Gutierrez, Chiapas.

 1            THE COURT REPORTER:  I need that spelling.

 2            THE WITNESS:  Sure.

 3       T-u-x-t-l-a G-u-t-i-e-r-r-e-z.

 4  A    And then the -- and you can tell this is the second document

 5  as well because there's a date of registration.  The date of

 6  registration is February 2010.  So this is clearly the second

 7  version.

 8            And most importantly, with the falsifications, is that all of

 9  the father's information has been removed.

10  Q    And the father, is that Miguel Rubalcava?

11  A    Yes.

12  Q    All right.  And did you obtain this document?

13  A    Yes.

14  Q    How did you obtain it?

15  A    This was in our filed documents.

16  Q    All right.  And is it a true and accurate copy of the second

17  birth certificate you found?

18  A    Yes.

19            MR. BENNETT:  I move to admit Exhibit No. 11, Your

20  Honor.

21            THE COURT:  Any objection?

22            MS. CHANG MORRISON:  No, Your Honor.

23            THE COURT:  11 is admitted.

24                 (Exhibit No. 11 admitted.)

25  Q    All right.  Please turn to Exhibit No. 12.

1      And do you recognize Exhibit No. 12?

2  A   Yes.

3  Q   What is it?

4  A   This is the paper where Respondent Chang, for a second time,

5  changed the name of her son.

6  Q   All right.  When did this happen?

7  A   I can see here it's dated in June of 2019.

8  Q   All right.  And did you participate in this proceeding?

9  A   I was present.

10 Q   Did Miguel Rubalcava participate in the proceeding?

11 A   No.

12 Q   Was he ever notified of the proceeding?

13 A   No.

14 Q   How do you know that?

15 A   I spoke with him recently, and he actually got ahold of these

16 documents, and we have talked about it.

17 Q   All right.  And Exhibit 12, is that a true and accurate copy

18 of an Island County Superior Court order changing the child's

19 name?

20 A   Yes.

21      MR. BENNETT:  Your Honor, I would move to admit Exhibit

22 No. 12.

23      THE COURT:  Any objection?

24      MS. CHANG MORRISON:  No, Your Honor.

25      THE COURT:  12 is admitted.

1                    (Exhibit No. 12 admitted.)

2    Q    All right.  And do Exhibits 10 through 12 indicate anything

3    to you?

4    A    Well, it goes to show that Respondent Chang is willing to

5    falsify documents and really do whatever it takes to set a

6    barrier between her children and their fathers.

7    Q    And are you worried she may do the same with you?

8    A    I know if she had the opportunity, she would exclude me from

9    my son's life permanently.  She's already attempted to do that.

10   Q    All right.  You testified earlier that Buena Vista is your

11   son's habitual residence, correct?

12   A    It is his habitual residence, yes.

13   Q    And why do you say that?

14   A    Well, I think there could be some confusion because we had,

15   you know, multiple places where we had lived in the past, but

16   when we left Whidbey Island in November of 2021, that departure

17   was permanent.  We had sold our house, we had sold or given away

18   essentially all of our belongings, and neither one of us had any

19   intention of ever residing there again.  So if there was any

20   confusion before that point in time, that confusion had come to

21   an end there, and at that point in time, we only had one home,

22   and our residence certainly would be in Buena Vista from that

23   point going forward, our habitual residence.

24   Q    All right.  And did Ms. Chang seek help from any authorities

25   to get her son to Island County when he was down in Mexico with

1    you?

2    A    Yes.  I believe she tried to get assistance from the Island

3    County courts, the FBI, and also the authorities in La Paz.

4    Q    All right.  Please turn your attention to Exhibit No. 26.

5         And do you recognize Exhibit No. 26?

6    A    Yes.

7    Q    What is it?

8    A    This is a Freedom of Information request that I made of the

9    FBI.

10   Q    All right.  And why did you make the request?

11   A    I wanted to understand what Respondent Chang had filed and

12   requested with the FBI.

13   Q    All right.  And please turn to Exhibit No. 2 -- or, excuse

14   me, Page No. 2 of Exhibit 26.

15        All right.  And does this state the current status of that

16   case?

17   A    Yes.

18   Q    What is it?

19   A    This is a letter showing that the FBI, on March 13th, 2023,

20   declined to prosecute regarding Ms. Chang's -- Respondent Chang's

21   allegations of international parent kidnapping.

22   Q    Is Exhibit No. 26 a true and accurate copy of the documents

23   received, pursuant to your Freedom of Information Act request to

24   the FBI?

25   A    Yes.

1        MR. BENNETT:  Your Honor, I move to admit Exhibit

2   No. 26.

3        THE COURT:  Any objection?

4        MS. CHANG MORRISON:  No, Your Honor.

5        THE COURT:  26 is admitted.

6            (Exhibit No. 26 admitted.)

7   Q   And, finally, please turn to Exhibit No. 29.

8       And Exhibit No. 29 is basically four photos, correct?

9   A   Yes.

10  Q   And did you take these four photos?

11  A   Yes.

12  Q   How did you take them?

13  A   On my phone.

14  Q   All right.  So referring to page 1 of Exhibit No. 29, you

15  took this photo with your phone?

16  A   Yes.

17  Q   When did you take it?

18  A   January 20th, 2023.

19  Q   All right.  And who is depicted there in the photo?

20  A   My son R.E.M. and his best friend.

21  Q   And where was the photo taken?

22  A   Just in front of his school in Los Barriles.

23  Q   All right.  Does your son have many -- well, did he make many

24  friends at school?

25  A   Yes.  He was friends with everyone.

1  Q    Okay.  Please turn to the second page of Exhibit No. 29.

2       And this is a photo you took with your phone, correct?

3  A    Yes.

4  Q    When did you take it?

5  A    This was December 7th, 2021.

6  Q    And what does this photo depict?

7  A    This is at our home, downstairs, with Respondent Chang, her

8  parents, and R.E.M. and his older brother.

9  Q    Okay.  Is that D.D.M.?

10 A    Yes.

11 Q    Okay.  All right.  And then please turn to page 3 of Exhibit

12 No. 29.

13      What does this photo depict?

14 A    Yeah.  This is the patio downstairs to our home in Buena

15 Vista, with my son R.E.M. filling up his swimming pool.

16 Q    All right.  And then Page No. 4 of Exhibit No. 29, what does

17 this photo depict?

18 A    Yeah.  So these are Respondent Chang's parents, R.E.M.'s

19 grandparents, and this is a picture of their home just a few

20 weeks before it was completed in Los Barriles.

21 Q    And is this the home you testified that you were helping them

22 with?

23 A    Yes.

24 Q    All right.  And are all of these photos true and accurate

25 copies of the photos you took with your phone?

 1  A    Yes.

 2           MR. BENNETT:  Your Honor, I move to admit Exhibit

 3  No. 29.

 4           THE COURT:  Any objection?

 5           MS. CHANG MORRISON:  No, Your Honor.

 6           THE COURT:  29 is admitted.

 7                     (Exhibit No. 29 admitted.)

 8  Q    All right.  You're requesting that the court order that your

 9  son be returned to Mexico to live, correct?

10  A    Yes.

11  Q    All right.

12           MR. BENNETT:  And I have no further questions at this

13  time, Your Honor.

14           THE COURT:  Cross-examination.

15           MS. CHANG MORRISON:  Yes, Your Honor.

16           THE COURT:  Ms. Chang, if you wish to examine the

17  witness, please step to the lectern.

18       Your interpreter is free to stand or sit right next to you.

19  And, again, even though you are asking questions, you are free to

20  consult with the interpreter.

21       You may proceed.

22                     CROSS-EXAMINATION

23  BY MS. CHANG MORRISON:

24  Q    Did you know about Damian's two birth certificates?

25           THE COURT REPORTER:  I'm sorry.  Could you ask that

 1    again, please?

 2         MS. CHANG MORRISON:  Yes.

 3    Q    Before we got married, did you know about Damian's two birth

 4    certificates?

 5    A    No.

 6    Q    Did your mom spend New Year's Eve with me and you and the

 7    kids in my house in Freeland?

 8    A    Yes.

 9    Q    That was December 31st.  She was served December 30th.

10         Did we talk about our divorce at the beginning of 2023?

11    A    Did we talk about which divorce?

12    Q    The divorce on Whidbey Island.

13    A    No.

14    Q    Did you try to move to Freeland with us?

15    A    No.

16         And I just want to clarify one of the previous questions.  We

17    did speak extensively regarding the divorce in Mexico in December

18    of 2022.

19    Q    In November, when we were at your mom's house and you bought

20    the tickets for E█████ and you, do you remember where were you

21    when you bought the tickets?

22    A    Yes.

23    Q    Can you tell me more about that?

24    A    I was in Langley when I bought the tickets.

25    Q    Do you remember that you were on the phone with the airline

1    and you came inside the house and you say that I needed to agree

2    because the airline was asking my permission in order to make

3    this purchase of the air tickets?

4    A    It would be very difficult for me to remember that because

5    that never happened.  You have falsified many things, and that's

6    just one of them.  I don't understand why.

7    Q    You say you drove.  So you did not take a flight to go to

8    Mexico with E████?

9    A    I didn't understand the question.  Can you repeat it?

10    Q    When you took E████ to Mexico on January 3rd, you drove,

11    because you didn't take a flight?

12    A    I didn't understand the last word.  "Drop" or "draw"?

13          THE COURT:  I believe the question was, did you drive?

14    Is that correct?

15          MS. CHANG MORRISON:  Yes.  I want to know --

16          THE COURT:  Did you drive?

17          MS. CHANG MORRISON:  -- why driving instead of taking a

18    flight.

19    A    We did take a flight.

20    Q    From where?

21    A    From Portland.

22    Q    To where?

23    A    San Jose del Cabo.

24    Q    Do you remember that E████ was -- had an ear infection and

25    he was on his third day of antibiotics?

1    A    I do remember that he had had an ear infection several days

2    earlier, and all of his symptoms had ceased.

3    Q    Okay.  He was in his third day of ten-day of treatment.

4    A    Is that a question?

5    Q    I'm asking you, do you remember that?

6    A    I have already answered that question.

7    Q    Okay.  You don't remember.  That's what I understand.

8         Do you know that the Mexican court already decided that they

9    do not have jurisdiction over our divorce in Mexico?

10   A    That's not a true statement.

11   Q    Okay.  When you filed that divorce in Mexico, the first

12   divorce that you filed in November, you said in Mexico that we

13   don't have children?

14   A    I don't know.

15   Q    Where my address was, where did you say that I was living?

16   A    I don't recall.

17   Q    When you go to the court in Mexico, you know that

18   there's like under oath, and you don't remember that if we have

19   children for a divorce?

20   A    I do remember if we have children, but that's not how the

21   process works in Mexico.  I gave information to my attorney, my

22   attorney put it together, and my attorney made the filing.  I

23   have never been present to make any of those filings, and I

24   don't have certainty about what files -- what materials were

25   filed.

1    Q    Okay.  Do you know that there's a proceeding for perjury?

2    A    I have seen that mentioned once by you.  I don't know if it's

3    true.

4    Q    Okay.  Have you ever -- always kept all our documents from

5    our family:  green cards, birth certificates, everything?

6    A    No.

7    Q    No?

8         Where do we keep all those documents?

9    A    There are number of documents in a number of places.  There

10   always have been.  But I have never kept any of those documents

11   from you.

12   Q    Where do we keep those?

13   A    Can you be more specific?

14   Q    Do you remember to have a big container with all our

15   documents together?

16   A    I do recall such.  I mean, there are several places where we

17   have documents.  There's a container that we would keep in

18   Mexico, and there was sometimes a container that we would keep in

19   the U.S.

20   Q    Did you sponsor D█████ to come to the U.S.?

21   A    Yes.

22        THE WITNESS:  Are we supposed to use people's names or

23   just initials for children?

24        THE COURT:  It's preferred that we use initials as

25   opposed to names.  That's consistent with the manner in which the

1    plaintiff testified.  And in order to keep the security of the

2    identification of the children, use initials, please.

3        Please, proceed.

4    Q    Have I ever give you an authorization to travel with E██████?

5    A    Yes.

6        MS. CHANG MORRISON:  Those are the questions that I had

7    at the moment.

8        THE COURT:  Okay.

9        Redirect examination?

10                        REDIRECT EXAMINATION

11   BY MR. BENNETT:

12   Q    All right.  You filed two divorces in Mexico, correct?

13   A    Yes.

14   Q    Was there any difference between the first one and the second

15   one, other than just the location where it was filed?

16   A    Not that I know of.

17   Q    Okay.  And you testified that Ms. Chang did authorize you to

18   travel to Mexico with R.E.M., correct?

19   A    Yes.

20   Q    Is that -- is that approval in writing?

21   A    No.

22   Q    Okay.

23        MR. BENNETT:  No further questions, Your Honor.

24        THE COURT:  Any further cross-examination of this

25   witness?

```
 1          MS. CHANG MORRISON:  For his witness?

 2          THE COURT:  Yes.  Are there any further questions of

 3    Mr. Morrison?

 4          MS. CHANG MORRISON:  Oh.

 5          THE COURT:  In other words, once counsel for the

 6    petitioner asks questions, then you cross-examine.  He's entitled

 7    to follow up on the questions that you asked, and then you're

 8    permitted to ask follow-up questions just about the questions he

 9    just asked.

10          MS. CHANG MORRISON:  Oh, just about those questions?

11          THE COURT:  Just about the questions he asked.

12          MS. CHANG MORRISON:  No, no.

13          THE COURT:  All right.  You may step down, sir.

14          THE WITNESS:  Thank you.

15          MR. BENNETT:  Your Honor, I would like to call Candace

16    Jordan --

17          THE COURT:  Please have her step forward.

18          MR. BENNETT:  -- as the second witness.

19          THE CLERK:  Please raise your right hand.

20                        CANDACE JORDAN,

21      having been sworn under oath, testified as follows:

22          THE CLERK:  Please have a seat.

23      If you could please state your first and last names and spell

24    your last name for the record.

25          THE WITNESS:  Candace Jordan, J-o-r-d-a-n.
```

```
 1                 THE COURT:  You may inquire.

 2                 MR. BENNETT:  Thank you, Your Honor.

 3                      DIRECT EXAMINATION

 4    BY MR. BENNETT:

 5    Q    So do you know Ryan Morrison?

 6    A    Yes.  He's my son.

 7    Q    All right.  And do you know the other party, Ms. Fany Chang?

 8    A    Yes.  Fany is my daughter-in-law.

 9    Q    All right.  So in June of 2022, did the parties come visit

10    you in Island County --

11    A    Yes.

12    Q    -- Washington?

13    A    Yes.

14    Q    Were you expecting their visit?

15    A    It was a surprise.

16    Q    Why do you say that?

17    A    It was just unexpected.  Well, I knew they were -- I guess I

18    knew they were coming for a visit, but the timing, I wasn't sure

19    exactly when they were arriving, because they were doing kind of

20    a house-hunting and trying to decide what -- their next moves,

21    so ...

22    Q    All right.  Did Mr. Morrison tell you how long he expected

23    the visit to last?

24    A    I remember it was about two weeks.

25    Q    And did Ms. Chang tell you anything different?
```

1  A    No, I don't think there was anything expressed.

2  Q    All right.  And did the parties stay with you during their

3  visit?

4  A    They did.

5  Q    And did the parties' visit extend?

6  A    Yes.

7  Q    Do you know why that happened?

8  A    They did not come to an agreement on what they were going to

9  do next, and so it continued to extend as they worked things out.

10 Q    And was Mr. Morrison happy with that?

11 A    No.

12 Q    How do you know?

13 A    He expressed his unhappiness, that he was ready to go back

14 home, and the intention had never been to stay more than two

15 weeks, although it was cooler here in the summer than it is in

16 Los Barriles.

17 Q    All right.  And then how long did Ms. Chang stay at your

18 place with R.E.M. and I guess D.D.M.?

19 A    Right.

20     They were at my house through the summer and then until they

21 moved to Freeland.

22 Q    And when you say "they moved to Freeland," who are you

23 talking about?

24 A    Oh, okay.  D.E.M. {sic}, R.E.M., and Fany moved.

25 Q    Okay.  And that was in December of 2022?

1  A    Yes.

2  Q    And did you know that Ms. Chang was going to move to Freeland

3  with her two children?

4  A    Just before she moved out.  She had some friends help her

5  move, so that was when I learned of that.

6  Q    All right.  And then where was Mr. Morrison at the time that

7  Ms. Chang moved out of -- well, just basically moved out of your

8  house?

9  A    I believe that at that point in time he had made a trip to

10  Mexico, but I'm -- yeah.  I'm sorry.  I don't have my journal

11  with me, so ...

12      I think you've got some dates that have been given.  I would

13  agree with those dates.

14  Q    All right.  And then when Mr. Morrison returned to, I guess,

15  Island County from Mexico, did he stay with you for a while?

16  A    Yes.  Intermittently, he stayed at his sister's house and at

17  his dad's.  And I have an apartment above my garage, so it was

18  kind of an easy way for him to come and go.  I didn't really

19  monitor where he was.

20  Q    But he wasn't continuously living with you?

21  A    No.

22  Q    All right.  That's -- oh, hang on.

23          MR. BENNETT:  All right.  That's all I have for this

24  witness right now, Your Honor.

25          THE COURT:  All right.  Cross-examination.

 1            No.  She's entitled to ask you some questions as well.

 2            THE WITNESS:  Yes.

 3                              CROSS-EXAMINATION

 4  BY MS. CHANG MORRISON:

 5  Q    When we came in June 2022 and we stay in your house, through

 6  these months, was Ryan trying to buy a property?

 7  A    Not that I'm aware of.

 8  Q    Didn't you go with us to see a property in Bay -- Bailey's

 9  [sic} Road?

10  A    Oh, you are going to have to help me with that.  Do you have

11  a specific -- any more specific information that would help me

12  remember where that might be?

13  Q    It is in -- I think there's like a fire station.

14            And you are a realtor and --

15  A    Yeah, past the fire -- oh, right, right, right.  Yes.  Yes.

16  RT -- yeah.  Uh-huh.

17  Q    Were we interested in buying that house?

18  A    Well, it needed a lot of work, but I think it was something

19  you seemed to be considering.  I don't know.  I wasn't part of

20  your intimate discussion about it.  But, yeah, it certainly

21  seemed to be a consideration.

22  Q    Did you show that to Ryan?

23  A    I believe so.  You're -- boy, I'm digging.

24  Q    Did you know that we were working with Mr. Forbes as a

25  realtor?

 1   A   On that house?

 2   Q   Yes.  And other properties.

 3   A   I knew nothing about Mr. Forbes in relation to the house on

 4   Bailey Road.  I know that you had a lot in Holmes Harbor that he

 5   was working with you on.

 6   Q   So he was a realtor, Mr. Forbes?

 7   A   He is a realtor, as far as I -- still is.

 8   Q   Our realtor?

 9   A   Beg your pardon?

10   Q   Our realtor.  Like we were using him as a realtor to make

11   offers to houses to buy.

12   A   I only knew or thought, I understood, that you were working

13   with him on your lot in Holmes Harbor.

14   Q   But you showed Ryan the lot, the fixer-upper home in

15   Bailey's, right?  Is that what you say?

16   A   You know, I took so many people there.  I took Misty there.

17   She was interested in it.  I showed Ryan.  And that's -- that was

18   quite a while ago.

19   Q   When you received in January this -- no.  December the 30th,

20   did you receive -- did you receive the documents for the divorce?

21   A   I do not recall that particular date, no.

22   Q   Okay.  Did you remember that we talked about the divorce on

23   Whidbey Island, in Island County?

24   A   A general conversation or something specific?

25   Q   The documents that you had on your desk.

1    A    On my desk?

2    Q    In the green envelope.

3    A    I don't recall that.

4    Q    Were you served with documents?

5    A    No.

6    Q    Did you spend New Year's with us --

7    A    I did.

8    Q    -- at my house in Freeland?

9    A    Did I spend time at your house in Freeland?

10   Q    New Year's Eve.

11   A    Oh, I'm sorry.  I thought you said "many years."  Yes, I was

12   there for New Year's Eve.  It was lovely.

13   Q    I appreciate everyone for -- because my English is not

14   perfect, and I understand that, please ask me if my question is

15   not clear.

16        Do you remember when Ryan left in November without notice?

17   A    I recall there was a time when I did not know exactly what

18   was going on between the two of you.

19   Q    Do you remember, again, one morning that I woke up and Ryan

20   was not there and I told you, "He is not here"?

21   A    Yes, I do.

22   Q    Did you know that he was leaving?

23   A    No.

24   Q    It was a surprise?

25   A    Yes.

1   Q    Do you remember that he took all my documents with him?

2   A    I don't recall that.  I don't -- I wouldn't have known that.

3   Q    Do you remember talking -- that, in the summer, Ryan was

4   screaming to you that he wanted to die?

5   A    I don't remember him saying that exactly, screaming -- I

6   do -- no, not that specifically.

7   Q    Do you remember that you send me the crisis line phone number

8   to call them?

9   A    That may -- that may have -- yes, I may have done that.  I

10  did do that.  I gave you the crisis line, uh-huh.  I don't recall

11  exactly why, but yes.

12  Q    Do you remember that summer giving a check to Ryan because he

13  felt that you were not a good realtor?

14  A    That was not what that discussion was about.

15  Q    Did you give a check to Ryan?

16  A    Yes, I did.  It wasn't because I was not a good realtor.  We

17  had a disagreement how he would have preferred I handle the

18  transaction, and after the conversation, I felt that that was

19  appropriate.

20  Q    Okay.  So Ryan blamed you because you didn't handle the

21  situation as his expectations and you gave him a check?

22  A    I wouldn't necessarily characterize it like that.

23  Q    Could you explain?

24  A    Well, that is a very strange question.

25       You had missed out on an opportunity on a property, and I

1  knew that finances were tight for you and that I could do

2  something to alleviate it.  I felt I had handled the transaction

3  properly, and you were not in the best position to be the ones

4  who would -- be the ones that the seller would agree to your

5  offer, because the other person was buying the two adjacent lots

6  and you were offering on one lot.  So, in the end, I decided that

7  it would be appropriate for me to do something to alleviate the

8  fact that you had not been able to purchase that one lot that you

9  could afford.

10  Q    Do you remember that I called you on January 4th asking for

11  information where E███████ and Ryan may be?

12  A    I would not be able to say that I could remember that

13  something happened on January 4th.  I do recall that you asked if

14  I knew where, but you already knew where they were because they

15  were in Buena Vista at the same home that your parents were, with

16  all -- both of them, so ...

17  Q    Do you remember texting back and forth with you, like I said,

18  "I don't know why they are; they didn't come"?

19  A    I do recall that you sent me text messages, but I also knew

20  where Ryan was and that you knew where he was.

21  Q    Yeah.

22      Do you remember the conversation that I say, "Ryan is in

23  Mexico with E███████," do you remember what was your answer?

24  A    No, I do not.

25  Q    Okay.  I do have a text, and it says --

1    A    I may have been surprised.

2    Q    -- something, and then you say, "You felt it."

3         Did you -- you knew before that he was going to Mexico?

4    A    No, I did not know that.

5    Q    You knew that he was taking E▓▓▓▓ with him?

6    A    No.

7         I knew that you were having a very contentious time, but, no,

8    I had no idea that was going to happen.

9    Q    You went to Mexico while he had E▓▓▓ there?

10   A    Yes.

11   Q    Do you remember that I sent some clothes with him?

12   A    Yes.

13   Q    And his stuffy?

14   A    Yes.

15   Q    Do you remember that I ask you and beg you to bring E▓▓▓▓

16   back?

17   A    Yes, I do remember that.

18   Q    Do you remember what was your answer?

19   A    I said I would do my very best.

20   Q    Do you remember what you said after that?

21   A    No, I do not.

22   Q    Do you remember that I send you the contempt hearing and the

23   order to bring immediately E▓▓▓?

24   A    Can you say that one more time, Fany?

25   Q    There was a contempt hearing and there was a contempt order

```
1    to immediately bring E█████ back to my custody.  Do you remember

2    that I sent you that information?

3  A    I do not remember that.

4  Q    So you don't remember your answer?

5  A    Was it something you e-mailed?

6  Q    I texted you.

7  A    The entire order?

8  Q    I did.

9  A    Okay.  I don't remember.

10       It was not an easy time.  There was a lot of stress.

11  Q    What was the reason that you were in Mexico when he had him?

12  A    He asked me to come down.

13  Q    Why?

14  A    And stay and visit and be a grandma.

15  Q    That was the reason?

16  A    Yes.

17       MS. CHANG MORRISON:  I don't have more questions.

18       THE COURT:  Okay.

19    Any redirect?

20       MR. BENNETT:  No redirect, Your Honor.

21       THE COURT:  Any objection to this witness being excused?

22       MR. BENNETT:  No, Your Honor.

23       THE COURT:  Any objection to this witness being excused?

24       MS. CHANG MORRISON:  I don't understand what the judge

25    is saying.
```

 1           (The interpreter and Ms. Chang confer.)

 2           MS. CHANG MORRISON:  Oh.  No.  Please.  That's

 3  everything that I have.

 4           THE COURT:  Okay.

 5           MS. CHANG MORRISON:  Thank you.

 6           THE COURT:  I'll ask the parties at the completion of

 7  every witness's testimony, other than the parties, in other

 8  words, you and Mr. Morrison, I will always ask, if a witness

 9  testifies, if you have any objection to them being excused,

10  meaning they will not be coming back to the witness stand and

11  testifying.

12      So that's the question I'm asking.  Counsel for Mr. Morrison

13  said "No," and I think your answer is "No" as well; is that

14  correct?

15           MS. CHANG MORRISON:  Yes, Your Honor.

16           THE COURT:  Okay.  You may step down.

17      We're at the end of today's proceedings.  We will start

18  tomorrow again, tomorrow morning, at 9 a.m.

19      And, counsel, have you rested your case at this point?

20           MR. BENNETT:  We do rest, Your Honor.

21           THE COURT:  So we begin tomorrow morning at 9 a.m.

22      Ms. Chang, you will have the opportunity to testify and to

23  bring any witnesses to testify.

24      The same process.  You will be subject to cross-examination,

25  and your witness would be subject to cross-examination, the same

 1    exact procedure that we used today, okay?

 2              MS. CHANG MORRISON:  Thank you.

 3              THE COURT:  All right.  We will be in recess.  We will

 4    pick up tomorrow.

 5         And, again, to remind you, the schedule is 9:00 until 11:00.

 6    I have a sentencing at 11:00 to 12:00, and then we start again

 7    from 1:30 until the completion of the trial day.

 8         We will be in recess.

 9              THE CLERK:  Please rise.

10                        (Adjourned.)

11

12                   C E R T I F I C A T E

13

14         I, Nickoline M. Drury, RMR, CRR, Court Reporter for the

15    United States District Court in the Western District of

16    Washington at Seattle, do certify that the foregoing is a correct

17    transcript, to the best of my ability, from the record of

18    proceedings in the above-entitled matter.

19

20

21                        /s/ Nickoline Drury

22                        Nickoline Drury

23

24

25